**In re NATALYA C.**

**No. 2006–230–Appeal.**

Supreme Court of Rhode Island.

April 30, 2008.

Paula Rosin, Esq., Providence, for Petitioner.

Karen A. Clark, Esq., Providence, for DCYF.

Frank P. Iacono, Esq., for Casa.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

This is an appeal from a Family Court decree terminating the parental rights of Stephanie Calise (Stephanie) to her daughter, Natalya, under G.L. 1956 § 15–7–7(a)(3) [1] and (a)(2)(iii).[2] On appeal, Stephanie argues that the trial justice erred when she found that the Department of Children, Youth and Families (DCYF) had met its burden of proving that it made reason-able efforts to achieve reunification between Stephanie and Natalya prior to DCYF's filing a petition to terminate parental rights (TPR).[3] After a thorough review of the record, we hold that the trial justice clearly was wrong when she found that DCYF made reasonable efforts to achieve reunification. For this reason, we vacate the Family Court decree that terminated Stephanie's parental rights.

### Facts and Procedural History

In August 1999, eleven-month-old Natalya[4] was removed from her mother's care as a result of Stephanie's continuing difficulties with substance abuse, and the child was placed in foster care with Stephanie's friend Lorraine Tammelleo. After DCYF offered services to Stephanie addressing both her drug use and mental-health issues,[5] she was reunited with Natalya and the case successfully was closed.

Unfortunately, DCYF once again became involved with the family in 2004, after Natalya made statements that suggested her mother was using drugs again. Based on this information, DCYF social

---

1. General Laws 1956 § 15–7–7(a)(3) says in relevant part:

   "The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

2. Section 15–7–7(a)(2)(iii) says in part:

   "The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem[.]"

3. Although Stephanie raises other arguments on appeal, we need not address those issues.

4. Natalya was born on September 9, 1998.

5. Stephanie has had a history of depression since she witnessed the murder of her mother and a train conductor while she was a passenger on an Amtrak train when she was a young girl. A lawsuit subsequently was brought against Amtrak, and Stephanie was awarded a financial settlement; she receives $1,700 each month for life and a lump sum payment every five years.

caseworker Bridgett Crook (Crook) met with Stephanie and Natalya in their home. Crook found the home to be clean and orderly, and she saw no signs of Stephanie's drug use. Crook reported that Natalya was neatly dressed, looked healthy, and was comfortable with her mother. Crook expressed no concerns about Natalya's welfare and she did not remove her from her mother's custody.

However, the situation took a turn for the worse at the end of September 2004. Stephanie's continued drug use led DCYF to file a Family Court petition for neglect under G.L. 1956 § 14–1–11.[6] When Stephanie was arraigned on that charge, she was ordered to provide a urine sample for drug screening. Stephanie declined to comply with the order, and she told the court that the test would be positive if she took it. As a result, the Family Court ordered that DCYF remove Natalya from her mother's care and authorized the agency to place the child back with foster mother Lorraine Tammelleo.

Although Stephanie had been receiving methadone treatments for drug abuse at the Discovery House throughout 2004, she stopped treatment in November 2004 because she said the program was "financially detoxing" her. Also, at about that time, Crook and Stephanie agreed on a case plan that was intended to help Stephanie end her drug use; the plan was to be effective from November 8, 2004 until May 10, 2005.[7] Among Stephanie's various obligations under the plan were requirements that she remain drug free, participate in substance-abuse treatment, and submit to supervised, random urine screens. DCYF also made certain commitments in the case plan; the agency was to "assist [Stephanie] in locating [a] substance abuse treatment program," and "obtain reports from service providers to ascertain mother's progress in treatment and/or to discuss areas of concern." Notably, this case plan did not provide for any psychological evaluations or mental-health treatment.

At the end of 2004, Stephanie told Crook that she had gone into drug treatment, but that she had relapsed. The record reveals that Stephanie entered SStar Detoxification Program (SStar) in November 2004, but that she was discharged before completing the program because of noncompliance with its requirements. Stephanie again entered SStar for detoxification on January 25, 2005, and this time she successfully was discharged on January 31, 2005. Although Stephanie had planned to receive follow-up treatment at the Tri–Town Program (Tri–Town) after completing the program at SStar, she was unable to do so because she was arrested for possession of a controlled substance soon after her discharge from SStar. This possession charge led to her incarceration at the Adult Correctional Institutions (ACI).

**6.** General Laws 1956 § 14–1–11 reads in relevant part:

(b) In the event that a petition is filed, any appropriate person having knowledge, information, or belief of the material facts that appear to warrant a petition may be a petitioner under this chapter and is not required to give recognizance or surety for costs. The petition shall be directed to the family court of the state of Rhode Island, setting forth that in the opinion of the petitioner the child is a delinquent, wayward, dependent, or neglected child, or otherwise comes within the provisions of this chapter, and requires the care and protection of the state, and all petitions, with the exception of those requesting the arrest and/or detention of any person, shall be sworn to before a licensed notary public. Those exceptions, as stated above, shall be sworn to by either a justice or clerk of the family court.

**7.** A subsequent case plan, which was effective from May 2 to November 1, 2005, contained almost identical provisions.

When Stephanie was released from the ACI, she once again met with Crook and informed the caseworker that, although she wanted to go to Tri–Town, she was having difficulty finding transportation. Crook offered to provide Stephanie with a list of other substance-abuse agencies, but she did not offer Stephanie any assistance with transportation.

Mary Thuot (Thuot), another DCYF social caseworker, assumed responsibilities for Stephanie and Natalya in June 2005. On June 15, 2005, Stephanie told Thuot that she was not participating in any substance-abuse treatment, but that she intended to do so at some point. However, a month later, Stephanie still was not in treatment. Thuot repeatedly admonished Stephanie about her needing to go to treatment at that time, but she conceded that she never referred Stephanie to any services. On October 31, 2005, when Stephanie continued to fail to engage in treatment, DCYF filed a TPR petition under § 15–7–7(a)(3) and (a)(2)(iii).

At the subsequent TPR hearing, the trial justice admitted into evidence Stephanie's medical records from the Discovery House and SStar, and she heard testimony from David Dorsey, the record keeper at the Discovery House, Crook, Thuot, and Stephanie. There were repeated references to Stephanie's mental-health issues in her Discovery House records. It is significant that in session notes from February 9, 2004, a counselor indicated that "[Stephanie] reports that she has very little motivation to do anything due to her depression." Later in the session, the counselor recorded: "[patient] appears to be depressed and in need of mental health care, which she says she is not interested in getting. [Patient] seems to be at high risk for relapse given her depression and the fact that she has no daily activities or interests[.]" The counselor's notes also indicated that Stephanie admitted that she was depressed, but she believed her depression was manageable because she was self-medicating with an antidepressant. The record reveals that at that time, although the counselor discussed a possible link between Stephanie's depression and her drug use, Stephanie did not acknowledge the connection and said she would be fine once she was reunited with her daughter. Stephanie's medical records from SStar also referred to her mental-health issues, specifically her depression diagnosis.

From her testimony before the trial justice, it appears that Bridgett Crook could not remember whether she ever reviewed Stephanie's medical records.[8] Crook testified that she was aware that Stephanie had witnessed her mother's murder and said she knew that Stephanie had received mental-health treatment during DCYF"s previous involvement in the matter. However, Crook admitted that Stephanie's current case plans did not address mental-health treatment.

During Stephanie's testimony, she provided further insight into her mental-health issues. Although she previously had denied any linkage between her mental-health issues and her chemical dependency, Stephanie testified that her depression triggered her drug use and also said that her depression caused her complete lack of motivation, which directly prevented her from engaging in drug counseling.

After reviewing the records and testimony, the Family Court terminated Stephanie's parental rights under § 15–7–7(a)(3)

---

8. It is undisputed, however, that DCYF had access to Stephanie's Discovery House records because she signed a medical release form on September 21, 2004. Indeed, the case plan required that DCYF review those records.

and (a)(2)(iii).[9]  A decision and decree to that effect were entered on May 16 and May 18, 2006, respectively.  In her decision, the trial justice found that (1) Stephanie was an unfit mother because of her failure to adequately address her chronic substance abuse, (2) DCYF took reasonable efforts to reunite Stephanie and Natalya before it filed a TPR petition, and (3) Natalya's best interests were served by terminating her mother's parental rights because of Stephanie's inability to properly care for her daughter.

With regard to her second finding, the trial justice said that Stephanie was offered services for her substance abuse, but that she did not sufficiently avail herself of those services to treat her addiction.  The trial justice noted: "DCYF encouraged [Stephanie] to get treatment, but did not take her in 'shackles' to drug treatment. The treatment must be initiated by the patient/parent, not DCYF.  Stephanie failed to make any good faith effort to get drug treatment."  Although the trial justice said that she believed that mental-health counseling might have been helpful to Stephanie, given her psychiatric history, she did not believe there was any legal basis to presume that Stephanie would have availed herself of drug treatment even if she had been in counseling for depression, and she noted that Stephanie never requested mental-health services. Finally, the trial justice said, "To assert at trial, through speculation and innuendo that she did not go to drug treatment because she was depressed is totally without merit and a poor excuse for her total noncompliance with the case plan and court ordered treatment."

Stephanie timely appealed the TPR decree to this Court, and she now argues that the trial justice erred when she found that DCYF met its burden of proving that it made reasonable efforts to achieve reunification between Stephanie and Natalya before it filed a TPR petition.  DCYF and Natalya's guardian *ad litem,* however, contend that the trial justice did not err on this issue.  We agree with Stephanie, and, thus, vacate the Family Court decree.

### Standard of Review

▮▮▮▮  When reviewing a decree involving the termination of parental rights, this Court examines the record to determine whether legally competent evidence exists to support the findings of the trial justice. *In re Jennifer R.,* 667 A.2d 535, 536 (R.I. 1995) (citing *In re Crystal A.,* 476 A.2d 1030, 1033 (R.I.1984)).  "A Family Court justice's findings are entitled to great weight and will not be disturbed absent a showing that the trial justice was clearly wrong or that material evidence was overlooked or misconceived." *In re Nicole B.,* 703 A.2d 612, 615 (R.I.1997) (citing *In re Antonio G.,* 659 A.2d 672, 673 (R.I.1995)).

### Analysis

▮▮▮▮  In our opinion, the trial justice erred when she terminated Stephanie's parental rights under § 15–7–7(a)(3) and (a)(2)(iii) because we conclude that DCYF did not prove, by clear and convincing evidence, that it made reasonable efforts to achieve reunification between Stephanie and Natalya before it filed the TPR petition.  "Natural parents have a fundamental liberty interest in the care, custody, and management of their child that does not evaporate if they are not model parents or have lost temporary custody of their child." *In re Antonio G.,* 657 A.2d 1052, 1057 (R.I.1995) (citing *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).  Thus, we have

---

9.  The parental rights of the biological father, Jason Otero, previously had been terminated on December 6, 2005, and he did not seek an appeal of that ruling.

said that "[a]ll rights to the custody, care, and nurturing of a child first reside with the parents," *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989), and "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Id.* (quoting *Santosky*, 455 U.S. at 760, 102 S.Ct. 1388).

To protect this fundamental interest, we have required that DCYF prove, by clear and convincing evidence, that it made reasonable efforts to encourage and strengthen the parental relationship prior to filing a TPR petition.[10] *See In re Manuel P.*, 889 A.2d 192, 196 (R.I.2006); *In re Nicole B.*, 703 A.2d at 617. " 'Reasonable efforts' is a subjective standard subject to a case-by-case analysis, taking into account, among other things, the conduct and cooperation of the parents." *In re Nicole B.*, 703 A.2d at 618. Interpreting this "reasonable efforts" requirement, we have said that DCYF, or the involved agency, need not be the sole provider of services to the parents; rather, the services may be offered by the agency *or* received elsewhere. *See* § 15–7–7(a)(3); *In re Raymond C.*, 864 A.2d 629, 634 (R.I.2005). We also have held that such services must be offered or received, "regardless of the unlikelihood of their success." *In re Manuel P.*, 889 A.2d at 198 (quoting *In re Christopher B.*, 823 A.2d 301, 311 (R.I.2003)).

Furthermore, we have said that the services received by parents must be designed to address or correct the particular situation that led to their children's placement in DCYF's care or custody:

"After all, if such services are to have any chance of success in correcting the situation that led to the children's removal from the family home, they must be 'reasonable' in the sense of being capable of remedying the particular problem(s) that caused the children to be removed." *In re Christopher B.*, 823 A.2d at 315.

In *In re Christopher B.*, after the mother's children were removed from her custody, DCYF offered her marriage counseling and supervised visitation despite various professionals' recommendations that specialized parenting education, because of her cognitive limitations, also was necessary to achieve reunification with her children. *Id.* at 304, 314. Because DCYF did not offer, and the mother did not receive, *any* parenting education, we held that DCYF did not make reasonable efforts. *See id.* at 316.

■ We fully recognize that reunification between a parent and child, even when DCYF has made reasonable efforts, is not always possible. Thus, we do not fault the agency when the treatment received does not resolve the underlying problem or when a parent's recalcitrance to treatment precludes reunification. *See In re Raymond C.*, 864 A.2d at 633 (holding that DCYF's efforts were reasonable, and that additional services would have been futile given that the mother had received treatment for her mental illness but continued to be an unfit parent); *In re Nicole B.*, 703 A.2d at 618 (holding that DCYF's reunification efforts were undermined by the "parents' reticence, their seemingly blind support of each other, and their collective allegiance to utter denial").

■ In this case, we agree with the trial justice that because Stephanie received substance-abuse treatment from the time her daughter initially was removed from her care in September 2004 until the filing of the TPR petition in October 2005,

---

**10.** It should be noted that this requirement does not apply to abuse petitions filed under § 15–7–7(a)(2)(ii). *See In re Nicole B.*, 703 A.2d 612, 617 (R.I.1997).

DCYF was not required to offer any additional drug counseling.

We believe, however, that it was wholly unreasonable for DCYF not to include *any* mental-health treatment in Stephanie's case plans, given that her mental illness was one of the primary barriers to her reunification with Natalya. Stephanie's case plans required that DCYF review her medical records. Thus, her caseworkers knew, or should have known, of the drug counselor's concerns about the paralyzing effects of Stephanie's depression and that this illness put her at "high risk for relapse." Furthermore, the caseworkers were well aware of the consistent trouble Stephanie had complying with drug counseling, but they failed to alter her case plans in any way to include mental-health treatment.

This clearly is not a case in which the treatment received by a parent did not resolve the underlying problem or in which a parent's recalcitrance precluded reunification. Rather, we are of the opinion that DCYF's complete failure to address Stephanie's depression made it highly unlikely that reunification would be successful, given the relationship between her depression and drug use.

In so holding, we explicitly reject the notions that Stephanie's not wanting and not requesting psychiatric counseling are at all relevant in determining whether DCYF made reasonable efforts to achieve reunification. As we expect a doctor, not his patient, to prescribe medicine to treat the patient's illnesses, we also expect DCYF to fashion effective case plans to enable reunification between parents and children. It is unreasonable for DCYF to rely on parents like Stephanie, who lack necessary expertise and perspective, and who labor under the burden of mental-health challenges, to diagnose their own problems and then conjure up effective treatment strategies.

Thus, we hold that the trial justice clearly was wrong when she terminated Stephanie's parental rights.

### Conclusion

For the foregoing reasons, we vacate the Family Court decree terminating Stephanie's parental rights. The record in this case is returned to the Family Court.