**Supreme Court**

No. 2012-1-Appeal.
(05-2250-2)

In re Evelyn C.                 :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Evelyn C.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The respondent-father Ralph C. (father), appeals from a Family Court termination of parental rights with respect to his daughter, Evelyn C.[1] Specifically, father contends that the trial justice erred in concluding that he has a substance-abuse problem that renders him unable to care for Evelyn. He further argues that there was insufficient evidence to support the trial justice's determination that it was unlikely that Evelyn could be returned to him within a reasonable amount of time. This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and after a review of the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## I

### Facts and Procedural History

Heather C. (mother) gave birth to Evelyn while at home in the town of Tiverton, Rhode Island. After being transported to a hospital in Fall River, Massachusetts, both mother and

---

[1] The parental rights of Evelyn's mother, Heather C., were also terminated by the same termination of parental-rights decree; however, she has not filed an appeal to this Court.

Evelyn tested positive for cocaine, opiates, and marijuana. Evelyn was treated for cocaine withdrawal and subsequently placed in foster care. Shelly Marshall, a social caseworker for the Department of Children, Youth and Families (DCYF or department), testified that she opened a case focusing on the custody and care of Evelyn after the hospital called the department in Rhode Island to report Evelyn's and Heather's positive drug tests.

Ms. Marshall testified that she first met with the parents on July 25, 2008, at which time she discussed the permanency time frames and requested that they sign the related disclosure.[2] Although mother was compliant with this request, Marshall stated that "father refused to look at the form and sign it." According to the social worker, her assessment at that time was that both parents needed substance-abuse treatment and mental-health care.[3] The parents' next visit with Marshall took place on August 1, 2008. Mother and father planned on moving to Massachusetts, so Marshall discussed the parents' wishes to seek services in that state rather than in Rhode Island. She informed them that "it would be very difficult if not impossible for [her] to really assist them" with services being obtained outside of Rhode Island. Ms. Marshall testified that, had the parents remained in Rhode Island, she would have referred them to CODAC, a substance-abuse treatment center and to the Access to Recovery Program. During the parents' visit with Evelyn on that same day, Marshall noticed a lot of tension within the parents' relationship because of rude comments they made to each other, with father often "just taking it."

---

[2] Ms. Marshall stated that the permanency time frame is a federal guideline that "advise[s] parents that we have certain time frames that we need to adhere to and that children can only be in care for a certain amount of time and that parents have within that window to do what they need to do in order to get their child back." Further, she said that "if a child is in care for 12 months and the parents are nowhere near reunification then the department per federal guidelines is required to file a termination of parental rights."

[3] Ms. Marshall's concern for father stemmed from his "marijuana use of 18 years."

Ms. Marshall stated that this type of interaction was constant between them and that addressing this problem became part of the case plan.

Ms. Marshall stated that, at the next visit, on August 7, 2008, father "disclosed some pretty significant abuse by his stepfather and mother." She testified that he also told her that he had not smoked marijuana in over thirty days but was "really struggling" with abstaining from it because it calmed him down. Ms. Marshall stated that she suggested that he see a psychiatrist and that father was "pretty receptive" to this idea.

Ms. Marshall reported that father arrived at her office unannounced on August 25, 2008. She stated that he said he was distraught because mother had been arrested for shoplifting the night before. According to Marshall, when she asked father why he stayed with mother when she treated him so badly, he replied that he has a "mommy complex" and that Heather is "mom" to him. Ms. Marshall testified that she told father that he "really needs to get it together in order to get his child back." During that meeting, Marshall stated, they also discussed father's substance-abuse issue, namely his use of marijuana; father indicated that he had been very stressed and had used marijuana. Ms. Marshall testified that she told him to call CODAC for treatment.

Ms. Marshall stated that she prepared separate case plans for the parents in September 2008. Father's case plan called for him to, inter alia: obtain gainful employment, find housing, participate in a substance-abuse evaluation, stop using all illegal substances, engage in a sober-parenting class, address his past abuse through counseling, engage in couples counseling, and engage in a psychiatric evaluation aimed toward considering his need for medication for anxiety, depression, and attention deficit hyperactivity disorder (ADHD). In addition, father was to tend to criminal charges pending against him, which, according to Marshall, stemmed from an arrest

in Rhode Island for possession of marijuana. Ms. Marshall stated that she attempted to refer father for substance-abuse treatment in Rhode Island, but that he refused her offer because he wished to remain in treatment at SSTAR in Fall River.[4]

The second case plan, dated July 15, 2009, was similar to the first. Father was to obtain employment, find housing, engage in counseling, refrain from using illegal substances, engage in a sober-parenting class, and comply with any court-imposed requirements related to criminal charges. Ms. Marshall indicated that she also informed the parents that, if they chose to live outside of Rhode Island, an ICPC[5] with the receiving state would have to be initiated and approved before reunification could occur. Ms. Marshall stated that father engaged in a parenting class at SSTAR, receiving a certificate of completion in December 2009 for his participation in a class called "Healthy Fathering-Healthy Children Group."

Describing her experiences with the parents during June of 2009, Marshall stated that the parents seemed to be doing well; they were receiving services at SSTAR and living in Fall River, and that a Massachusetts caseworker had been working with the family. During a visit on June 9, 2009, she stated that she informed the parents that an ICPC that had been submitted to Massachusetts was still pending, but that it appeared as though Evelyn would be sent home to her parents. On July 14, 2009, during a telephone call to SSTAR, Marshall was informed that the parents had signed only a limited release for information so the parents' counselor could no longer talk to her. Subsequently, mother informed Marshall that she had relapsed, testing positive for cocaine, benzoids, and marijuana in late May and early June of 2009. Placement in Massachusetts was denied because of mother's relapse, as well as allegations of domestic

---

[4] SSTAR (Stanley Street Treatment and Resources) is located in Fall River and provides mental-health and substance-abuse treatment to clients.

[5] ICPC refers to the Interstate Compact on the Placement of Children. See G.L. 1956 § 40-15-1.

violence between the parents. According to Marshall, father claimed that he was not aware that mother was using drugs again.

According to Marshall, during a meeting with the parents in August 2009, father told her that he was doing intensive outpatient treatment at SSTAR. Ms. Marshall stated that she told the parents that there was no longer any room for error and that, if they could not "get it together," the department would file a petition to terminate their parental rights. Describing the parents' visitation with Evelyn, Marshall stated that mother did most of the parenting while father often watched television or sat back and let mother care for the child. Ms. Marshall testified that, when she encouraged father to interact with Evelyn during visits, to play with her and hold her, he told her that he did not like to hold children unless they are sick.

An administrative review was held on January 13, 2010, at which time, according to Marshall, mother had again tested positive for cocaine and, although living together at the time, father denied that he was aware of mother's relapse. Ms. Marshall testified that father again stated that he did not believe children should be held, admitted that he did not know how to care for his daughter's needs, and indicated that Evelyn "is the mama's baby." During a conversation with father on January 27, 2010, Marshall attested, he told her that he would be looking for an apartment in Rhode Island, that he and mother were no longer together, and that he would like to visit Evelyn by himself. Ms. Marshall stated that she told him that she was still concerned about his interactions with Evelyn and that his expectations of the child were inappropriate for her age; however, father told her that mother "is the nurturer," while "he would be the provider." Ms. Marshall also stated that, although the department had provided separate times for visitation, the parents always got back together and arrived at the visits together. At a visit on February 9, 2010, mother was not in treatment and the parents did not have an apartment.

Ms. Marshall discussed a referral that she made in February or March of 2010 for father to participate in a parenting program at the Children's Museum. She stated that father was not accepted to the program because, during an intake interview, he stated that he did not need to learn anything and he asked the interviewer whether she had any children; when she refused to answer, he indicated that she could not teach him anything if she had no children.

A third case plan was put into effect in May 2010 that contained the same objectives as the 2008 case plan, which, Marshall stated, showed that father had not made much progress while the case was open. Ms. Marshall testified that she reviewed the case plans with both parents during a meeting on July 20, 2010, and, although the goal was still reunification, a termination petition was discussed. Ms. Marshall testified that father told her that he had done everything that he needed to do; she added that she informed him that he had not been consistent with his mental-health or substance-abuse treatment and that he continually chose mother over the child.

At the time of trial, Marshall testified that mother was in Tennessee, had not seen Evelyn for four months, and was willing to consent to an open adoption. Ms. Marshall stated that Evelyn was currently two and one-half years old and had been living in the same foster home since birth. She testified that Evelyn was doing well and had bonded with her foster parents, who were willing to adopt her. Further, she stated that it was her belief that it was in Evelyn's best interests to be adopted by the foster parents.

Nancy Granshaw, a clinician employed by SSTAR in Fall River, testified that she began providing services to father in July 2008 and was still seeing him at the time of trial. The goal of his treatment plan was to address "issues of co-dependency in his relationship with [mother], and to meet the requirements of the [DCYF] plan for him to complete the requirements of the service

plan and also to address his own past issues and to reduce his harm from substance abuse." Speaking of father's "[c]annabis dependence," Granshaw testified that she worked with him individually, that he had completed an intensive outpatient program, and that he actively participated in a relapse-prevention group. Ms. Granshaw stated that, although she did not have any drug screens for father, he self-reported that he had used marijuana as recently as March 2011, as well as in May, July, August, September, and December of 2010. In the year prior, he had been clean and sober for nine or ten months, but his use had increased within the last six months before the time of the trial. Ms. Granshaw testified that father still attends the relapse-prevention group and is "very appropriate" in that group.

Ms. Granshaw also testified as to father's co-dependency issues, explaining that father reported that mother was physically and verbally abusive toward him on many occasions, but that he had "this need to be with her." According to Granshaw, when a person is involved in an abusive relationship, it is very difficult to recover from substance dependency. She testified that, during his treatment, father also disclosed that he had suffered childhood sexual abuse at the hands of his stepfather as well as physical abuse by both his mother and his stepfather. "Treatment progressed slowly," stated Granshaw, partly because "so many sessions were spent calming down the latest crisis" between him and mother, but also because of his difficulty in being able to focus and concentrate due to a diagnosis of ADHD.

Ms. Granshaw testified that she discussed father's role as a parent with him and, in her opinion, if father gained custody of Evelyn, he would need "[p]retty significant services" as a support. She further explained that father had focused on his problems with mother for so long, that treatment time for other issues was minimal. When asked whether these issues—co-

- 7 -

dependency, childhood trauma, and his ongoing substance abuse—would affect his ability to parent, Granshaw attested that they would currently have a negative effect on his parenting.

Although father refused to sign a release for his treatment records from SSTAR, they were ultimately admitted as a full exhibit at trial. Those records indicate that, at the outset of his therapy, father admitted to his counselor that he was a "pot head" and estimated that he spent $40 per day on his marijuana habit. The records track father's progress over the course of more than two years of counseling and participation in group sessions and show father's insistence on continuing to use marijuana.

Gina Corsetti, a child-support technician for DCYF, responsible for transporting children in the foster care system to visits with their parents and supervising those visits, testified regarding Evelyn's visits with her parents. Ms. Corsetti testified about a visit that took place at the Providence Place Mall on December 29, 2009, at which time the parents arrived fifteen minutes late and "were all over the place." She stated that mother was yelling at father and it was "kind of chaotic." When asked how often this sort of thing happened, Corsetti replied: "Usually every visit." Ms. Corsetti testified that, when the visits took place at the Bristol office of DCYF, mother would take toys out to play with Evelyn, but father mostly just sat on the floor and watched movies. Ms. Corsetti indicated that there was not much interaction between father and Evelyn when mother was present. When Corsetti was asked whether the visits had progressed between December 2009 and December 2010, she replied that they had become worse because of the frequent bickering between mother and father in front of Evelyn.

Ms. Corsetti testified that father has visited with Evelyn alone since January 2011. Although her notes indicated that father was "very appropriate" at a visit on January 25, 2011, on the March 8, 2011 visit, Evelyn threw a tantrum and father, rather than comforting her, stated

that Evelyn was "going to have to get used to him because when she is sick after [being returned to him], he is going to be all she has and that * * * she needs to get used to not feeling well around him." After describing several more visits, Corsetti was asked whether there had been any improvement in the interaction between father and Evelyn since January 2011, and she answered that there had not.

Paula Toland, from the "Families Together" program at the Providence Children's Museum, testified regarding her observations of father. She stated that both parents had been referred to the program in January 2010 by Shelly Marshall; however, mother was eventually rejected because she had not been clean and sober and in active treatment for thirty days. Ms. Toland testified that she observed several visits between the parents and Evelyn, beginning on January 19, 2010. She noted, first, that while mother exhibited strong parenting skills, father needed "significantly more support in most areas." Ms. Toland stated that father's "interaction and his parenting were * * * inconsistent" because he "needed significant direction in how to talk to" Evelyn and play with her at an age-appropriate level. She reported that father interacted with Evelyn more as a peer than as a parent.

Ms. Toland testified that father was accepted to the museum program and assigned to one of the program's clinicians, Amanda Grandchamp. However, his acceptance was rescinded due to several concerns that arose after father made certain statements to Grandchamp during a meeting. Ms. Toland also stated that she agreed with the department's decision to file a termination petition based upon "Evelyn's age and the length of time she had been in [the department's] care."

Father testified on his own behalf, and stated that he was not aware that mother had been using drugs at the time of Evelyn's birth. He admitted that he had used marijuana "[a]t least five

- 9 -

times" since Evelyn's birth and, on cross-examination, that he had seven marijuana convictions over the years. He stated that he was "kind of self-employed" as a boat painter, worked for several companies, and had been married and divorced five times. Declaring that he had "a great relationship with [his] daughter," he requested that the termination petition be denied.

The trial justice issued a written decision in which she reviewed the evidence and set forth her findings of fact. She found that father "had many failed attempts to remain substance free" and that he had not been able to parent and bond with Evelyn, although DCYF had made reasonable efforts to provide him with services. The trial justice determined that "[f]ather's failure to successfully complete and outright reject parenting services offered at all times * * *, his inability to remain substance free, along with his failure to address his relationship and past abuse renders him unable to unify with his child."

The trial justice found that both parents were unfit due to chronic drug use. She noted father's history of chronic substance abuse and a substantial criminal record related to drug possession and use, and she stated that he "continued to smoke marijuana continuously during the reunification process." The trial justice determined that father was unfit due to his failure to address issues related to his history of abuse and co-dependency and that he failed to improve his parenting skills, despite having participated in parenting classes. The trial justice also found that Evelyn had been in DCYF custody for at least twelve months and, that, despite the department's efforts, her return to her parents within a reasonable time was not likely, considering her age and need for a permanent home. The trial justice concluded:

> "Both of these parents are chronic drug users who have let it overtake them and their ability to be a parent to their child. * * * Unconditional love and support for a child are shown through the efforts that one undertakes to show that one is worthy of the honor of being called a parent. If Mother and Father truly wanted reunification with their daughter, they would have moved heaven

- 10 -

and earth to show their worthiness, or at the very least been compliant with three (3) separate case plans to give them that chance. * * * All of the evidence substantiates that it is in the best interest of the child that Mother and Father's rights be terminated."

A final decree terminating father's rights was entered on September 7, 2011.

Further facts will be provided as may be necessary to discuss the issues raised on appeal.

## II

## Standard of Review

Because a natural parent has "a fundamental liberty interest in the care, custody, and management of their children," a Family Court trial justice must find, by clear and convincing evidence, that a parent is unfit before terminating his or her rights to a child. In re Amiah P., 54 A.3d 446, 451 (R.I. 2012) (quoting In re Destiny D., 922 A.2d 168, 172 (R.I. 2007)). This Court, on appeal, will review a trial justice's ruling on a termination of parental rights with an examination of the record to ascertain whether legal and competent evidence lend support to his or her findings. Id. In our review, a trial justice's findings are entitled to great weight and will not be overturned unless we determine that they "are clearly wrong or the trial justice overlooked or misconceived material evidence." Id. (quoting In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008)). However, upon a trial justice's determination of parental unfitness, "the best interests of the child outweigh all other considerations." Id. (quoting In re Jazlyn P., 31 A.3d 1273, 1279 (R.I. 2011)).

## III

## Discussion

The grounds upon which a Family Court justice may base a termination of parental rights

are set forth in G.L. 1956 § 15-7-7.[6]  The trial justice terminated father's parental rights pursuant

to § 15-7-7(a)(2)(iii) (chronic substance abuse) and § 15-7-7(a)(3) (lack of substantial probability

of child's return).  On appeal, father contends that the trial justice erred in concluding that he has

a substance-abuse problem and, also, that there was insufficient evidence to support the trial

---

[6] General Laws 1956 § 15-7-7(a) provides, in pertinent part:

> "The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:
> "* * *
> "(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:
> "* * *
> "(iii) The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home.  The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem;
> "* * *
> "(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home."

- 12 -

justice's determination that it was unlikely that his daughter could be returned to him within a reasonable amount of time.

## A

### Chronic Substance Abuse

Father admits that he is a recovering drug addict, but he asserts that his recovery has been "remarkable" because he has not used crystal methamphetamine for more than twenty years and has been consistent with his treatment, including more than seventeen years in substance-abuse counseling. In his prebriefing statement, father notes that his "missteps in using marijuana might more accurately be portrayed as small missteps in a generally successful recovery process, given the larger picture of his long term treatment history, lack of use of hard core drugs for over two decades, and ability to disclose and discuss [his] recent marijuana use."

"With respect to the finding of unfitness because of chronic substance abuse, this Court has defined the term chronic as '[w]ith reference to diseases, of long duration, or characterized by slowly progressive symptoms; deep seated and obstinate, or threatening a long continuance * * *.'" In re Shawn M., 898 A.2d 102, 107 (R.I. 2006) (quoting In re Tara P., 836 A.2d 219, 223 (R.I. 2003)). Father argues that his marijuana use "does not approach the level of drug use evident in this Court's past cases in which parental rights were terminated for chronic substance abuse," and he cites to In re Shawn M., 898 A.2d at 107. However, we find In re Shawn M. to be closely analogous to the facts of the case before us.

There we upheld the trial justice's finding of mother's chronic substance abuse where she used drugs for more than half her life, tested positive for drug use, failed to comply with her agreement with DCYF, refused to release her substance-abuse counselor's records to DCYF, was discharged from several rehabilitative programs, had used drugs shortly before the trial, and her

rehabilitative service providers' general consensus was that she required more intensive substance-abuse counseling. In re Shawn M., 898 A.2d at 107. In the case at bar, father testified that he is a drug addict, but that he is "in recovery" and "doing the best [he] can." He began smoking marijuana when he was around eighteen years old and has a history of crystal methamphetamine use, for which he "got in trouble and went to prison for a while," but that he is "almost 20 years crystal meth free." Father has seven marijuana convictions on his record, one of which caused him to be on probation at the time of the trial because he had been "caught with a bag" of marijuana "right after Evelyn was born." He has been in treatment for "cannabis dependence" since July 2008, and, although part of his three separate DCYF service plans was to "stop using all illegal substances immediately and any medication not prescribed to him by a physician," he subsequently used marijuana in May, July, August, September, and December of 2010, in February 2011, and again in March 2011, which was shortly before the beginning of his trial. Further, father's clinician was concerned that "rather than reducing the harm in the last six months[,] it's gone the other way" because, although his sobriety was looking a little better in 2009, since 2010 it has been on a downward trend.

Section 15-7-7(a)(2)(iii) states that "[t]he fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem[.]" We are satisfied that there is a copious amount of evidence in the record to support the trial justice's finding of chronic substance abuse by clear and convincing evidence.

**B**

**Return of Evelyn to Father in a Reasonable Amount of Time**

Father also argues that there was insufficient evidence to support the trial justice's determination that it was unlikely his daughter could be returned to him within a reasonable amount of time. Father contends that, although there was a recommendation to place Evelyn with him and mother at one point, mother's relapse with her drug use caused placement to be withdrawn "even though [father] was dutifully engaging in all of the services required of him by both [the] Massachusetts and Rhode Island departments." He asserts that the primary reason Evelyn was in foster care for a period of time exceeding the twelve-month-placement period was because of mother's recurring drug problems, rather than his own conduct, because he "followed through with most of DCYF's recommendations." Further, he maintains that the department did not provide him with adequate services until he was facing a termination determination rendering the services provided "useless." The department argues that efforts were made to reunify father with his daughter from the inception of the case.

Before parental rights are terminated, the department must "demonstrate to the Family Court that it has made reasonable efforts to strengthen the parent-child relationship in accordance with the provisions of § 15-7-7(b)(1)."[7] In re Gabrielle D., 39 A.3d 655, 665 (R.I. 2012) (quoting In re Brooklyn M., 933 A.2d 1113, 1125 (R.I. 2007)). Further, when the department "attempts to

---

[7] Section 15-7-7(b)(1) states, in pertinent part:

> "In the event that the petition is filed pursuant to subdivisions * * * (a)(2)(iii) * * * of this section, the court shall find as a fact that, prior to the granting of the petition, such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship so that the child can safely return to the family."

- 15 -

terminate parental rights pursuant to § 15-7-7(a)(3), which requires that the child has been placed in the legal custody or care of DCYF for at least twelve months, the parent must be offered or receive services to correct the situation which led to the child being placed." In re Gabrielle D., 39 A.3d at 665-66. "As a result of both that statutory mandate and the need to protect the parent's fundamental liberty interest in the care, custody, and management of his or her child, 'DCYF [must] prove, by clear and convincing evidence, that it made reasonable efforts to encourage and strengthen the parental relationship prior to filing a [termination of parental rights] petition.'" Id. at 666 (quoting In re Natalya C., 946 A.2d 198, 203 (R.I. 2008)).

"The criterion of 'reasonable efforts' is 'subject to a case-by-case analysis [that takes] into account, among other things, the conduct and cooperation of the parents." In re Gabrielle D., 39 A.3d at 666 (quoting In re Nicole B., 703 A.2d 612, 618 (R.I. 1997)). "Moreover, in our consideration of whether or not DCYF has made reasonable efforts, we employ a 'totality of the circumstances approach,' pursuant to which 'the efforts required from DCYF to satisfy the reasonable efforts standard vary with the differing capacities of the parents involved.'" Id. (quoting In re Kayla N., 900 A.2d 1202, 1209 (R.I. 2006)). Even when the department has fulfilled the required reasonable efforts, there is a chance that it may not be possible to preserve and reunify a family. Id. "For that reason, provided that reasonable efforts have been made, 'we do not fault the [department] when the treatment received does not resolve the underlying problem or when a parent's recalcitrance to treatment precludes reunification.'" Id. (quoting In re Natalya C., 946 A.2d at 203 and In re Jose Luis R.H., 968 A.2d 875, 882 (R.I. 2009) ("DCYF 'need not undertake extraordinary efforts to reunite parent and child.'")).

The department "need not be the sole provider of the necessary services to the parent(s); we have expressly indicated that 'the services may be offered by the [department] or received

elsewhere.'" In re Gabrielle D., 39 A.3d at 666 (quoting In re Natalya C., 946 A.2d at 203). "However, regardless of whether the services are offered by DCYF or provided by another source, it is well established that such services 'must be offered or received, regardless of the unlikelihood of their success.'" Id. (quoting In re Natalya C., 946 A.2d at 203).

In the case presently before us, three case plans were created (September 15, 2008, July 15, 2009, and May 12, 2010), which laid out specific risk areas concerning father, including: the financial stability of the family, the health of his relationship with mother, a history of criminal behavior, his substance abuse, and his mental health.[8] Father was informed of the permanency time frames during his initial meeting with his DCYF social worker, but he "basically ignored [her] and refused to listen to what [she] had to say," ultimately refusing to sign the disclosure. He consistently refused to take up residence or receive services in Rhode Island, even though he experienced bouts of homelessness, which caused the reunification process to be delayed.

Although father completed some of the tasks the service plan required him to complete before reunification could be effectuated,[9] he failed to accomplish the majority of them. As discussed supra, father did not stop using all illegal substances; in fact, he used them up until less than a month before the trial. He did not submit to random weekly urine screens or sign a release of his substance abuse and mental health treatment records.[10]

---

[8] The only difference in these three plans is that the 2009 plan removed the part of the service plan focused on father's relationship with mother and the 2010 plan inserted a risk area focusing on family violence.

[9] Father did gain legal employment, rented an apartment from approximately June 9, 2009 to February 9, 2010, attended all his court hearings, participated in substance-abuse treatment, completed a sober-parenting class, engaged in individual counseling, and met with a psychiatrist.

[10] This Court notes that father not only prevented DCYF from obtaining information surrounding his mental-health and substance-abuse treatment by signing only a limited release, but he actively prohibited the release of these records even at the time of the trial. Prior to Granshaw taking the stand, father still adamantly refused to sign a release for his records.

In a consultation summary letter dated September 15, 2010, Toland stated that "[o]bservations of [father's] visits and discussions with him indicated substantial need for intensive education and clinical support before an assessment of his ability to safely parent Evelyn could be completed." Even at the time of trial, almost three years after his daughter's birth and placement within her current foster family, his own clinician agreed that father would still need to make significant improvements in the areas of his past trauma, co-dependency issues, family relationships, and substance abuse before she would discharge him from services.[11]

The trial justice found that:

> "[Father] failed to avail himself of the plethora of opportunities offered to him by DCYF to address his past abuse and co-dependency with the mother. Additionally, Father has been unable to benefit from any of the parenting-related services offered to him to better equip him with the skills to raise a child. His outright rejection of the Museum services and denial of the suggestion that he needed services render him unfit to parent Evelyn."

The trial justice also found that there was ample clear and convincing evidence to support the reasonable efforts made by the department to reunify father with his child, but that father "set up barriers" to the help that the department could provide to him. The trial justice stated that father showed by "his unwillingness to work on improving his parenting skills and failure to remain sober and follow through with all other aspects of the case plans," that he was unfit. Further, the trial justice found that it was not in Evelyn's best interest, having spent her entire life in foster care, "to remain in foster care for the next three (3) years of her life." She concluded that

---

[11] When asked if she saw any improvement, Granshaw stated that she saw "some improvement, but not [an amount] sufficient to stop treatment at this time." After being asked in what areas she saw some improvement with father, the only area in which she reported improvement was with his dependency on mother; however, she stated that she would recommend ongoing treatment in that area. This Court notes that, at the time of trial, mother and father had ended their relationship approximately six months previously and mother was living in Tennessee.

"Evelyn deserves permanency and a family who will be able to properly care for her and provide a safe environment to meet her needs," but that father is unable to do so because he had not "done what [he] needed to do to be reunified with [his] daughter."

We agree and find no error with the trial justice's determination that the department granted father a plethora of opportunities and services to enable him to reunite with his daughter, but the respondent either did not take advantage of these services or failed to use them to improve his situation, and that, therefore, it was unlikely that father's daughter could be returned to him within a reasonable amount of time.

## IV

## Conclusion

There is ample evidence to support the trial justice's finding that the department proved by clear and convincing evidence that the father was a chronic substance abuser and that it was unlikely that his daughter could be returned to him within a reasonable amount of time. Accordingly, the decree of the Family Court is affirmed. The papers in this case shall be remanded to the Family Court.



**TITLE OF CASE:**       In re Evelyn C.

**CASE NO:**       No. 2012-1-Appeal.
(05-2250-2)

**COURT:**       Supreme Court

**DATE OPINION FILED:**   June 18, 2013

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Newport County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Karen Lynch Bernard

**ATTORNEYS ON APPEAL:**

For DCYF:  Karen A. Clark
Department of Children, Youth & Families

For CASA:  Shella R. Katz
Court Appointed Special Advocate

For Respondent:  Lara E. Montecalvo
Office of the Public Defender