June 17, 2022

**Supreme Court**

| | | |
|---|---|---|
| In re Jae'La G. | : | No. 2021-23-Appeal. |
| | | (PNG 16-612) |
| | | |
| In re Jae'Ona G. | : | No. 2021-24-Appeal. |
| | | (PNG 16-613) |
| | | |
| In re Jae'Ona G. | : | No. 2021-25-Appeal. |
| | | (P 18-5730) |
| | | |
| In re Jae'La G. | : | No. 2021-26-Appeal. |
| | | (P 18-5729) |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Jae'La G.          :          No. 2021-23-Appeal.
                                    (PNG 16-612)

In re Jae'Ona G.         :          No. 2021-24-Appeal.
                                    (PNG 16-613)

In re Jae'Ona G.         :          No. 2021-25-Appeal.
                                    (P 18-5730)

In re Jae'La G.          :          No. 2021-26-Appeal.
                                    (P 18-5729)

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  The respondent father, Jason Smith, appeals from a Family Court decree terminating his parental rights to his two children, Jae'La G., born in May 2014, and Jae'Ona G., born in November 2015 (collectively the children), pursuant to G.L. 1956 § 15-7-7(a)(3).[1]  Although DCYF's

---

[1] There were neglect petitions and termination of parental rights petitions filed against the respondent with respect to both children. All petitions were heard and decided together.  The four appeals were consolidated by order of this Court on July 27, 2021.  The respondent is not challenging the findings of neglect.

- 1 -

petitions were also filed against the children's mother, Brittany G., she executed a direct-consent adoption before trial and is thus not a part of these appeals.[2]

These consolidated appeals came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in these appeals should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that these appeals may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## I

### Facts and Travel

The respondent first became involved with the Department of Children, Youth, and Families in 2012 after an incident that involved Keandra, the mother of his two sons, and Keandra's then-twelve-year-old son, who is not respondent's child.[3] In 2015, respondent pled nolo contendere to second-degree child abuse and simple assault/domestic charges. The respondent was sentenced to a five-year suspended sentence, with probation, and no contact with Keandra and her son.

---

[2] To protect the identities of the children, in this opinion, we will use the children's biological mother's first name and last initial only.

[3] We note that there are inconsistencies in the record as to the spelling of Keandra, Jae'La, and Jae'Ona. We utilize the spelling from the documents that were introduced as trial exhibits in Family Court. Keandra, her son, and respondent's sons with Keandra are not a part of this case.

Thereafter, respondent again came to the attention of DCYF in September 2016, when the department was contacted by the Central Falls Police Department to report that there had been a domestic incident between respondent and Brittany. After reviewing the DCYF history, it was discovered that respondent had been "red flagged for criminal child abuse and neglect charges, domestic violence and potential sex offender charges regarding a minor in Massachusetts." Upon completing an investigation, the DCYF child protective investigator indicated the case for neglect. The criminal charges against respondent stemming from the 2016 incident were dismissed at the request of Brittany and sealed on November 22, 2016.

On December 9, 2016, DCYF filed petitions alleging that the children were neglected because (1) respondent failed to provide each child with a minimum degree of care, supervision, or guardianship, and (2) each child was without proper parental care and supervision. On December 12, 2016, a social worker with DCYF, Jaimee Clerc, was assigned to the case. When Clerc's involvement with the case ended in February 2018, Barbara Silvia, a social caseworker, took over the assigned case. In 2017, respondent became incarcerated after pleading nolo contendere to possession of over 400 grams of marijuana with intent to deliver, and a violation of his probation. The respondent was released in December 2017.

On November 27, 2018, DCYF filed petitions to terminate respondent's parental rights to the children (the TPR petitions). DCYF contended that each child

had been in the custody or care of DCYF for at least twelve months, that respondent had been offered or received services to correct the situation that led to the children being placed in DCYF custody, and that there was not a substantial probability that the children could safely return to respondent's care within a reasonable period of time.

A trial on the neglect petitions and the TPR petitions was held between September 12, 2019, and September 15, 2020. On September 14, 2020, a permanency hearing took place, at which the trial justice approved DCYF's service plan goal of adoption. Numerous exhibits were admitted into evidence during the trial, including respondent's psychiatric records, several certificates of completion for programs that respondent completed while at the Adult Correctional Institutions, three DCYF service plans for each child, records from the Providence Center, and records from the Massachusetts Department of Children and Families. DCYF presented witness testimony by John P. Parsons, Ph.D., Robert Tyler McMahon Jr., Jaimee Clerc, and Barbara Silvia.

# A

## Testimony

### 1

#### Dr. John Parsons

At trial, Dr. Parsons testified as an expert in psychology with a specialization in psychological assessments and assessments for children and families. Doctor Parsons stated that he was asked to complete an evaluation in addition to conducting an interactive session with the children; he conducted an assessment of respondent and the children between March and June 2018. Doctor Parsons testified that he met with respondent on March 30, 2018, the initial assessment date. Doctor Parsons stated that, overall, there were "four extended sessions anywhere from between [ninety] minutes to [two] hours" with respondent and a final session with the children.

Doctor Parsons indicated that he began respondent's session with a clinical review, wherein respondent disclosed that, when he was a juvenile, he had been arrested for sexually assaulting a twelve-year-old girl, who he believed at the time to be sixteen years old, and that he had been incarcerated for six months. Moreover, respondent discussed his adult criminal history, including the issues of domestic violence, child neglect, and criminal charges for possession of marijuana. The

respondent indicated to Dr. Parsons that he smoked marijuana "two times per week or one time per day[.]"

Doctor Parsons testified that he performed cognitive testing on respondent and determined that respondent "was of low-average intelligence." The respondent's responses to the doctor's questions about his emotions and feelings were not an accurate representation, according to Dr. Parsons. Similarly, Dr. Parsons reported that respondent's responses to a drug abuse screening were also inconsistent. Doctor Parsons stated that respondent's responses to a bipolar disorder stress checklist struck him as odd, and that respondent's answers to the Minnesota Multiphasic Personality Inventory additionally struck him as invalid. Doctor Parsons testified that respondent's affect was flat with no emotions; he seemed irritable, but there were no signs of overt anger, which struck Dr. Parsons as odd given the circumstances.

For the parent/child portion of the assessment, Dr. Parsons explained that the children were present in the office before respondent entered the session. When respondent entered the room where the children were, respondent came in, sat in one of the chairs, and did not speak for a few minutes; respondent did not acknowledge the children, according to Dr. Parsons. Doctor Parsons found it to be significant that, after observing the children playing, respondent asked either one or both children to come sit on his lap; however, neither child responded, and they had their backs to

respondent. Doctor Parsons testified that, eventually, one of the children crawled to respondent on her hands and knees, and respondent picked her up and put her on his lap.

Doctor Parsons further stated that the only time the children were "engrossed in any way" was when respondent put cartoons on his telephone. The respondent did not ask the children any questions, and they did not respond to him until he told them to pick up toys at the end of the session, according to Dr. Parsons. Doctor Parsons recounted that the older child cried hysterically after respondent told the children to pick up the toys, and no one "said good-bye or hugged[.]" He stated that this suggested that there was a clear absence of a showing that respondent cared to show love and affection toward his children.

As for forensic recommendations and findings, Dr. Parsons stated that he recommended that, despite respondent having taken a parenting class while in the ACI, he needed to retake a parenting class "because there was no evidence of a bond, no evidence of how to interact with his children." He additionally recommended substance abuse treatment and a psychiatric evaluation. Moreover, Dr. Parsons recommended that respondent sign releases of information in order to allow Silvia, the DCYF caseworker, to monitor compliance and progress. Doctor Parsons maintained that it was a significant risk to reunify the children with respondent due to respondent's substance abuse history, multiple arrests, admission of sexual assault

- 7 -

as a teenager, incarcerations, drug crimes, allegations of domestic violence, and his "complete lack of parenting skills with [the children]."

On cross-examination, Dr. Parsons testified that respondent was cooperative during the evaluation, although he missed an appointment on April 26, 2018. Doctor Parsons acknowledged that respondent had mentioned that his greatest fear was being a bad father, his mind was focused on his children, he was concerned about his children, and his greatest worry was losing his family. Doctor Parsons conceded that, based on those statements, respondent cared about his children. Doctor Parsons further acknowledged that it was possible that there was no emotional bond between respondent and the children because they were "in a strange place[.]" However, Dr. Parsons added that it was respondent's responsibility "to get up, go over and sit down with them, explain what's happening, ask how they're doing, make good eye contact."

**2**

**Robert Tyler McMahon Jr.**

McMahon, a DCYF child protective investigator, testified that in 2016 he was assigned to this case when the police department informed him that there had been a domestic incident between respondent and Brittany. McMahon testified that, when conducting a review of the DCYF history, he noticed that respondent had been red-flagged for criminal child abuse and neglect charges, domestic violence, and

potential sex offender charges. McMahon stated that a review of the police report from the domestic incident that he was investigating revealed that the children were home at the time of the incident. He further stated that a no-contact order was put in place after the domestic incident.

Following the domestic incident, McMahon went to the ACI intake service center to interview respondent. According to McMahon, he reviewed the allegations against respondent and advised him of the no-contact order. McMahon testified that respondent indicated to him that respondent had family out of state, and he had no intention of returning to the home due to the no-contact order. McMahon testified that he ultimately indicated respondent for neglect.

### 3

### Jaimee Clerc

Clerc, a DCYF social worker, testified that, on December 16, 2016, neither Brittany nor respondent appeared in court for the scheduled arraignment on the two neglect petitions. Clerc further stated that, at the December 16, 2016 arraignment, she expressed concerns to the court over "[t]he domestic violence situation that was ongoing[,] * * * that mother was still allowing father into the home, [and] that there had been * * * another [h]ot [l]ine call very recent to the arraignment date." Clerc confirmed that the Family Court hearing justice had charged her with removing the children from the home at that time.

After the arraignment, Clerc, a DCYF caseworker, and the police went to the home in Central Falls. Clerc testified that respondent answered the door and told them that Brittany had left a few days earlier with the children to go to Florida. Clerc noted that, pursuant to the safety plan in place, respondent was supposed to have moved out of the home "and not have any unsupervised contact with the children." Three days later, on December 19, 2016, Clerc, a DCYF caseworker, and the police went back to the house; Clerc testified that respondent allowed only police into the home. Clerc testified that respondent reported that he did not know where Brittany and the children were. Clerc testified that they were eventually able to locate Brittany and the children at a homeless shelter in Lowell, Massachusetts. On December 23, 2016, the Family Court issued an order that the children were to be placed in the temporary custody of DCYF.

On March 9, 2017, Clerc; her supervisor, Ms. Fernandes; and respondent met at the DCYF office, according to Clerc. Clerc testified that the purpose of the meeting was to go over respondent's history and the services he needed to complete for his case planning. Clerc confirmed that the service plan goal at that time was reunification with either one or both parents. As to the services respondent was asked to complete, Clerc testified that he was asked to participate in batterers' intervention, which respondent indicated he had done before, and Clerc stated that he was not "terribly receptive to doing it again." Additionally, Clerc testified,

respondent was asked to complete a parent/child evaluation, some parenting services, and possibly a substance abuse evaluation to determine if substance abuse services were necessary.

According to Clerc, on April 25, 2017, an e-mail was sent to respondent to schedule parenting services and visitation, which initially was to be biweekly for respondent. Clerc testified that it was her recollection that respondent missed the first two scheduled visitations. She also testified that respondent had been referred to Boys Town for parenting visitation services, but that, on May 9, 2017, she was notified by Boys Town that respondent had not started the program. The following day—May 10, 2017—Clerc was notified that respondent was incarcerated on charges of possession of marijuana.

Clerc also testified regarding service plans; Clerc stated she created the first two service plans. The plans required that respondent address significant parenting concerns and domestic violence history by complying with court orders regarding the child abuse charges, refraining from physical punishment, completing a parent/child evaluation, completing all recommendations in that evaluation, and maintaining adequate housing when released from the ACI. The respondent was also required to complete anger management and domestic violence counseling, utilize skills learned in counseling in interactions with others, and refrain from abusive and intimidating interactions with others.

Clerc further testified that, although she was present in court for the permanency hearing on November 29, 2017, respondent was not because he was still incarcerated at the ACI. However, Clerc stated, respondent was present in court for a review date on February 16, 2018, because he had been released from the ACI. Clerc testified that her assignment to the case ended on February 16, 2018.

Clerc testified that respondent provided copies of certificates of completion for classes he completed while in the ACI. On cross-examination, Clerc stated that respondent did not complete any services that DCYF referred him to while she was involved with the case; however, she acknowledged that some of the classes respondent completed at the ACI complied with the service plan. She added that DCYF wanted respondent to complete a supervised visitation program at Boys Town for feedback on visits.

**4**

**Barbara Silvia**

When Clerc's assignment ended in February 2018, Silvia was assigned to the case. At trial, Silvia testified that there was a no-contact order in place for respondent and the children due to domestic violence issues. She added that, despite the no-contact order, respondent was still in contact with the children because, when she entered the home for a visit with Brittany and the children, the children yelled out, "Daddy, daddy." Moreover, Silvia testified that the children were removed from

their mother's care and placed back into nonrelative foster care when, in February 2018, a tip from the hot line revealed that respondent was with the children in a restaurant.

Silvia and her supervisor, Betsy Aubin, met with respondent on March 20, 2018, to go over and develop service plans. Silvia testified that she developed a new case plan in March when she was assigned to the case. As stated in the service plans, respondent was required to complete a psychological parent/child evaluation; follow recommendations; participate in a visitation program at the discretion of the children's clinician to increase parenting skills as well as learn the skills to maintain safety and well-being; ensure that the children's basic needs were met, including maintaining housing that met the minimum housing standards; and sign releases of information to allow DCYF to communicate with providers. Furthermore, the plan required respondent to obey laws and abide by all conditions of probation,[4] utilize the skills learned from the batterers' intervention program, and refrain from violent or abusive behavior. The respondent was also required to engage in both mental health counseling and a substance abuse evaluation that included weekly random toxicology screenings, and he was required to follow recommendations.

---

[4] Silvia testified that she contacted respondent's probation officer to get information on the conditions of his probation so that they could be incorporated into his services.

- 13 -

As a result of Silvia's March 2018 meeting with respondent, she completed referrals for respondent's services; respondent was referred to Dr. Parsons. Silvia testified, however, that she could not make a referral to the Providence Center because "parents need to make their own referrals for that agency[,]" although she encouraged respondent to do so. She later testified that she did assist respondent in enrolling at the Providence Center by sending him certified mail to verify his address. Silvia additionally testified that, while visits had been set up between Brittany and the children, visits had not been arranged for respondent because there was a court order stating that visits had to be clinically recommended for the children, which at that time had not yet occurred. Silvia stated that the order had been modified following the parent/child evaluation, and visitation was approved by the children's clinician. Silvia acknowledged that she contacted authorities in Massachusetts, where respondent's mother lived, to determine whether the children could be placed with her. She testified that Massachusetts declined placement of the children with respondent's mother.

Silvia testified that, on May 2, 2018, there was a hearing in which parent/child sessions had been permitted at the recommendation of the children's clinician. Thereafter, with the clinician's approval, monthly visits with respondent were established. Silvia testified that the visits initially occurred at the DCYF office, but that respondent later received a referral for the Northern Rhode Island Visitation

Center, a program that provides "wraparound" services with the family. Silvia explained that she considered that to be an appropriate program because "the goal remained reunification at that time," and respondent had completed the parent/child evaluation with Dr. Parsons as well as reported that he was engaged in services through the Providence Center for mental health services.

Next, Silvia testified on the third set of service plans provided for respondent, dated September 20, 2018. Those plans closely mirrored the previous plans; however, the requirement for a psychiatric evaluation had been added. Silvia further testified that respondent had signed releases for DCYF to obtain his juvenile records from Massachusetts. Silvia stated that respondent denied being registered as a sex offender and reported that he had been involved in an incident in Massachusetts as a minor but it was "plead [*sic*] out to a different charge." Silvia testified that, on July 26, 2018, she had a conversation with respondent on the telephone, in which she reminded respondent that the substance abuse screenings were to be conducted weekly; according to Silvia, respondent told her that the screenings were only being completed on a monthly basis.

Silvia testified that, on July 27, 2018, she supervised a visit between respondent and the children, and she described the children as hesitant and nervous to greet respondent. She stated that respondent provided snacks and allowed the children to play games on his telephone. Silvia confirmed that this was the first

meeting between respondent and the children in a DCYF setting. The respondent was accepted into the Northern Rhode Island Visitation Center program in late August 2018, but he did not start services until October 2018, according to Silvia. Silvia testified that the program required respondent to be engaged in mental health counseling, and that he had discontinued his services with the Providence Center. Thus, respondent was not able to start services until October because he had to attend two mental health counseling services before visitation could begin.

Silvia testified that she was not aware whether respondent maintained engagement in the mental health treatment because, on October 31, 2018, DCYF was ordered by the court to file TPR petitions within thirty days. She also testified that, to her knowledge, respondent did not attend the weekly toxicology screenings. Additionally, Silvia testified that the children were doing well and that they had been together in the same placement since their removal from the home in December 2016, except for two months when they were returned to their mother's care.

On cross-examination, Silvia confirmed that, on February 24, 2019, she received an e-mail from respondent asking to meet and for the names of service providers. When asked if that was in accordance with the service plan, Silvia responded that it was not, because the service plan goal at that time was not reunification, due to the court order to file the TPR petitions within thirty days. Silvia stated that, after the filing of the TPR petitions in November 2018,

respondent's monthly visitations remained the same. Silvia stated that, although visits remained in place, respondent stopped visiting in November and December 2018, and he did not reengage in the visitations until after a court hearing in March 2019.

Additionally, Silvia acknowledged that respondent sent her e-mails through July 2019 to set up visits, and respondent had invited her in October 2018 to inspect his apartment that he had obtained for the children. Silvia testified that respondent and the children attended a session with Dr. Parsons, which was a part of the service plan. Although respondent attended two sessions with Northern Rhode Island Visitation Center in October and November 2018, Silvia testified, respondent then missed a session and never reengaged. Silvia further stated that, upon respondent missing the session and not reengaging, he was sent a ten-day notice and ultimately was discharged from the program in January 2019 for noncompliance.

Moreover, Silvia stated that DCYF did not receive the substance abuse screenings that respondent reported that he was doing monthly with the Providence Center. Regarding batterers' intervention training, Silvia testified, respondent completed the training prior to engaging services with her, and he submitted a copy of the completed form. Silvia testified that she did not know whether respondent completed mental health counseling and a psychiatric evaluation, which was a required service respondent had to complete. Silvia acknowledged that, prior to the

filing of the TPR petitions, respondent attended two counseling sessions at LifeSpan after being discharged from the Providence Center.

**5**

**Respondent**

The respondent provided extensive testimony, both for DCYF and on his own behalf. Beginning with his testimony for the department, respondent stated that he had been charged with second-degree child abuse, to which he pled nolo contendere, and no services were put in place by DCYF after that incident. He testified that he completed batterers' intervention as a part of his probation. At the time respondent testified, he was still on probation for the child abuse and marijuana charges. The respondent stated that he spent nine months in the ACI for the marijuana charge and was released in December 2017. Furthermore, respondent acknowledged that, when he was sixteen, he was accused of statutory rape, but pled to a lesser charge of aggravated assault.

The respondent admitted that a domestic incident took place involving Brittany in 2016, although he stated that no "physical argument" occurred. He also testified that the children, along with Brittany's older child, who is not respondent's child, were present in the home at the time of the incident. The respondent denied that McMahon went over a safety plan with him in 2016 or that he had agreed to leave the home at that time. However, respondent testified that, when DCYF told

him to leave the home, he did. According to respondent, when the criminal case was dismissed in 2016, he returned to the home because McMahon did not specify that the DCYF case was separate and distinct from the criminal case.

The respondent stated that, when Clerc was looking for Brittany and the children, he did not know where they were. He admitted that he did not file a missing-persons report. The respondent denied that Clerc set up any services for him, asked him to address parenting issues, or required him to undergo a parent/child evaluation. The respondent additionally could not recall whether Clerc had asked him to complete anger management or domestic violence counseling. Likewise, respondent stated that Silvia did not ask him to complete anger management and domestic violence counseling. The respondent testified that he was not told that he had to go to substance abuse treatment, and thus he was not in substance abuse treatment. He confirmed completing a parent/child evaluation with Dr. Parsons.

In March 2018, respondent testified, he met with Silvia and Aubin and discussed his attendance at the Providence Center. He stated that he went to his appointments at the Providence Center, but later switched his provider to LifeSpan. The respondent testified that the first time he went to the Providence Center for those services was in September 2018, because it took some time for him to get an appointment. He testified that he attended two visits at the Northern Rhode Island

Visitation Center, but respondent stopped attending when the plan goal changed to, what he deemed to be, the termination of parental rights.

On cross-examination, respondent testified that, regarding his sons with Keandra, he had visitation with them twice a week and spoke to them on the telephone two to three times a day. The respondent stated that he was a full-time student at the Community College of Rhode Island, where his educational focus was general studies. Additionally, respondent testified, he obtained his GED while he was at the ACI, and he also earned certificates of completion related to substance abuse, job search skills, parenting skills, and counseling. The respondent acknowledged that he continued to smoke marijuana recreationally about once a week.

The respondent testified that he sent an e-mail in January 2018 to DCYF inquiring about reunification. At that time, the children had been reunited with Brittany. The respondent stated that he had also reached out to Silvia by e-mail, asking for referrals, but that Silvia said, according to respondent, that, because DCYF was focused on termination, referrals for services would no longer be made.

The court-appointed guardian *ad litem* next cross-examined respondent. The respondent acknowledged that there were three warrants issued for his arrest when he failed to appear in court while the child abuse charges were pending. The respondent contended that it was not his fault that he missed the court dates, and he

ultimately voluntarily surrendered himself. The respondent stated that the child abuse charge stemmed from when he accidentally elbowed Keandra's son during an incident with Keandra.

On redirect examination by DCYF, respondent admitted that, when he was arrested in 2017, he had a serious marijuana problem. His heavy marijuana use began when his children were removed, according to respondent. The respondent further admitted that there had been a substantiated Massachusetts investigation for excessive and inappropriate discipline with the sons he shares with Keandra.

On further examination by his attorney, respondent confirmed that he was still on probation at the time of trial for the 2017 marijuana conviction, and that he had not violated the terms of his probation. On recross-examination by the guardian *ad litem*, respondent confirmed that there was a Massachusetts order in place to "keep separate" from Keandra and her son when respondent was charged with child abuse and domestic simple assault in 2012.

Testifying on his own behalf, respondent stated that he did everything that was required of him by DCYF. He stated that he had attended counseling at the Providence Center approximately two times, but the appointments were not as frequent as he was "comfortable with" and he needed to see a psychiatrist for medication. He stated that it was for those reasons that he switched from the Providence Center to LifeSpan, where he received helpful treatment. In addition,

respondent stated, he leased an apartment with bedrooms for the children and his two sons when they visited, and he had been going to school as well as working two jobs, earning $250 per week. The respondent testified that he was in anger management treatment at the Providence Center, and he went to Common Sense Parenting, Open Doors, and Boys Town.

## B

### Motion to Dismiss and the Trial Justice's Decision

When DCYF rested, counsel for respondent moved to dismiss the TPR petitions, arguing that DCYF had failed to demonstrate by a preponderance of the evidence that respondent was an unfit parent, that he had failed to comply with the service plan, and that DCYF had failed to show that there was a reasonable likelihood that the children could not be reunified with respondent. The guardian *ad litem* contended that the motion to dismiss was not a valid motion; rather, it should have been one for directed verdict. Moreover, she argued that DCYF had met its burden of proving by clear and convincing evidence that respondent's rights should be terminated. The trial justice denied the motion, citing to what he deemed compelling testimony from both Silvia and Dr. Parsons.

On October 1, 2020, the trial justice delivered a bench decision. The trial justice stated that the decision was "based upon the most weighty, relevant and credible evidence." The trial justice found by clear and convincing evidence that the

children had been neglected by respondent. This determination was based on the fact that the children had been removed from respondent's care for over two years, visitation occurred only in supervised settings, and there was no evidence as to what support respondent provided for the children. The trial justice focused on Dr. Parsons' testimony that respondent showed little affect and did not ask any personal questions about the children.

Turning next to the issue of termination of parental rights, the trial justice noted that Clerc testified that respondent was unwilling to discuss his criminal history and unwilling to participate in batterers' intervention and that, despite referrals to parenting and visitation programs such as Boys Town, respondent failed to engage in those services during Clerc's involvement in the case. Moreover, the trial justice found that, when Silvia was assigned to the case, she went over the service plans with respondent in March 2018. The trial justice noted that there was a safety plan in effect, which was violated when respondent was spotted at a restaurant with the children, and the children were subsequently removed from Brittany's care. The trial justice also found that respondent did not comply with the weekly toxicology screening requirement. The trial justice noted that Silvia was unable to verify that respondent complied with the requirement of mental health counseling at the Providence Center.

The trial justice was most impressed by the testimony of Clerc and Silvia. He stated that, when Clerc was assigned to the case, respondent did not complete any of his service plan requirements. Although Silvia acknowledged that respondent had completed some tasks when she was assigned to the case, he did not complete all tasks. Silvia was especially concerned with respondent's failure to address substance abuse issues due to his marijuana use. The trial justice found it of note that Dr. Parsons felt that reunification of the children with respondent presented a serious risk, and that the doctor stated that respondent needed a parenting program.

The trial justice found that DCYF had carefully developed three service plans to address why the children were in placement, and that respondent never fully completed a service plan. The trial justice ultimately decided that, by clear and convincing evidence, respondent was unfit to parent the children and had failed to comply with and complete his service plans. In addition, the trial justice found that it was in the best interest of the children that the parental rights of respondent be terminated. A decree entered setting forth the trial justice's findings of fact and granting the neglect and TPR petitions on November 20, 2020, and respondent filed timely notices of appeal.

## II

## Standard of Review

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Manuel P.*, 252 A.3d 1211, 1218 (R.I. 2021) (quoting *In re Rylee A.*, 233 A.3d 1040, 1051 (R.I. 2020)). That interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate." *Id.* (quoting *In re Indiana M.*, 230 A.3d 577, 583 (R.I. 2020)). The fundamental right of parents, however, is "not absolute[.]" *Id.* (quoting *In re Indiana M.*, 230 A.3d at 586). The Family Court justice must find that the parent is unfit before terminating a parent's rights. *E.g.*, *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019). "Given the drastic and irreversible nature of a termination of parental rights decree, 'the right to due process requires that the state support its allegations by clear and convincing evidence.'" *In re Rylee A.*, 233 A.3d at 1051 (quoting *In re Violet G.*, 212 A.3d at 166).

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Violet G.*, 212 A.3d at 166 (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). Those findings "are entitled to great weight, and this Court will not disturb them unless they are clearly wrong

or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451).

## III

## Discussion

## A

## Parental Fitness

On appeal, respondent argues that the trial justice erred in finding that he was unfit. In particular, respondent takes issue with the trial justice's finding that he "failed to comply, and complete his case plans." The respondent avers that he had substantially complied with the service plans, and a finding of unfitness was "at odds" with the evidence presented. The respondent asserts that DCYF sought "to minimize the worth of the programs and classes he attended while incarcerated."

DCYF argues that a finding of unfitness was supported by the evidence in that respondent "failed to complete a number of [service] plan requirements." Similarly, the guardian *ad litem* contends that the evidence supported the trial justice's findings that respondent was unfit. The guardian *ad litem* further argues that respondent was unable to address his own case plan needs, "which resulted in a lack of cooperation with the array of services that the Department attempted to provide for [respondent's] family to facilitate reunification."

Before terminating parental rights, pursuant to § 15-7-7(a)(3), the trial justice must find by clear and convincing evidence that the parent is unfit. Specifically, the statute states that a trial justice shall terminate any and all legal rights of the parent to the children if the trial justice finds by clear and convincing evidence that

> "[t]he child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]" Section 15-7-7(a)(3).

"This Court has said that the 'refusal to cooperate with the objectives of the case plans constitutes clear and convincing evidence of a lack of interest in the child[ren] and, as such, could properly serve as a basis for a finding of parental unfitness.'" *In re Elana W.*, 249 A.3d 287, 294 (R.I. 2021) (brackets omitted) (quoting *In re James H.*, 181 A.3d 19, 27 (R.I. 2018)).

In finding respondent unfit, the trial justice found by clear and convincing evidence that the children had been in the care of DCYF for a period in excess of twelve months—since February 2018. Moreover, his determination rested on respondent's failure to comply with several requirements and/or services that DCYF included in the service plans, such as those related to parenting skills, violence prevention, and substance abuse. The trial justice found that, while Clerc was

- 27 -

assigned to the case, until February 2018, respondent failed to complete any of the services to which he had been referred. The trial justice explicitly stated that Clerc referred respondent "to the Boys Town Visitation and Parenting Services program[,]" in which respondent did not engage. We view the trial justice's findings as supported by legal and competent evidence, namely, the testimony provided by Clerc, Silvia, and Dr. Parsons. Additionally, the trial justice found that respondent was tasked with completing weekly toxicology screenings; however, respondent admitted to completing them only monthly. While we acknowledge respondent's efforts during his incarceration, we are also of the opinion that respondent failed to proactively continue engaging in the required services upon his release from the ACI.

Accordingly, our review of the record convinces us that legally competent evidence exists to support the trial justice's findings as to parental unfitness.

## B

### Reasonable Efforts to Reunify

The respondent further argues that his conduct and DCYF's effort in providing reasonable visitation were relevant factors in determining whether DCYF made reasonable efforts toward reunification. The respondent submits that, despite his completing a parent/child evaluation, DCYF filed the TPR petitions instead of making referrals consistent with Dr. Parsons' recommendations. The respondent

further contends that suspending visitation until it was approved by the children's clinician was not consistent with DCYF's obligation "to offer services to strengthen the parent-child relationship and to preserve the bond." Again, respondent notes that he substantially complied with all service plan tasks.

DCYF counters by arguing that the department cannot be faulted for a lack of visits when the Family Court was justified in conditioning visitation on the recommendations from the children's clinician and the outcome of Dr. Parsons' evaluation. Moreover, DCYF maintains that the Family Court was aware of respondent's "history of domestic violence and drug use." DCYF further asserts that the Family Court correctly found that the service plans were carefully developed, and respondent never fully completed a plan. The guardian *ad litem* also argues that the record amply supports the trial justice's findings of reasonable efforts.

"Section 15-7-7(a)(3) 'mandates that DCYF establish by clear and convincing evidence that it offered services that amount to a reasonable effort to correct the situation that led to the child[ren]'s removal from the parent's care.'" *In re Gelvin B.*, 251 A.3d 503, 510 (R.I. 2021) (quoting *In re Violet G.*, 212 A.3d at 167). We have held that DCYF does not need to "demonstrate that it took extraordinary efforts"; rather, DCYF must "employ reasonable efforts, and the reasonableness of such efforts must be determined from the particular facts and circumstances of each case." *Id.* (quoting *In re Violet G.*, 212 A.3d at 167). This Court has stated that

reasonable efforts is "a subjective standard subject to a case-by-case analysis, taking into account, among other things, the conduct and cooperation of the parents." *In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I. 2009) (quoting *In re Natalya C.*, 946 A.2d 198, 203 (R.I. 2008)). We have previously held that reasonable efforts include "suitable arrangements for visitation[.]" *Id.* (quoting *In re Nathan F.*, 762 A.2d 1193, 1195 (R.I. 2000)).

In deciding this issue, the trial justice found that DCYF carefully developed three service plans, and respondent never completed a plan. As to visitation, we note that Clerc testified that, until May 2017, visitation was biweekly; however, respondent missed the first two visits and never contacted Boys Town to engage in parenting services and supervised visitation. Additionally, Dr. Parsons reported that, during the parent/child evaluation, respondent made little effort to engage with the children. Silvia also testified to setting up visitation services at the Northern Rhode Island Visitation Center, with which respondent failed to comply until October 2018. Silvia further testified that respondent was ultimately discharged from the visitation center in January 2019 due to missing sessions and for noncompliance with the program. The trial justice found the testimony of Clerc, Silvia, and Dr. Parsons to be "clear, convincing, credible, and compelling." This Court has previously stated that "[s]uch a finding is entitled to 'a substantial amount of deference due to the fact that the trial justice has had an opportunity to appraise witness demeanor and to take

- 30 -

into account other realities that cannot be grasped from a reading of a cold record.'" *In re Gelvin B.*, 251 A.3d at 510 (deletion omitted) (quoting *Tsonos v. Tsonos*, 222 A.3d 927, 934 (R.I. 2019)). We similarly are of the opinion that respondent's argument regarding conditioned visitation is unpersuasive. The conditioned visitation was ordered by the Family Court and was not a discretionary decision made by DCYF. *See In re Kristen B.*, 558 A.2d 200, 204 (R.I. 1989) ("The suspensions of visitation were always court ordered and not discretionary with DCF.").

We therefore decline to declare the conclusion made by the trial justice on the issue of reasonable efforts to reunify as clearly erroneous.

## C

### Due Process

As his final argument, respondent contends that the Family Court made conclusive merit findings prior to the completion of the trial that were "prejudicial and violated fundamental notions of fairness and due process, both procedural and substantive, under the Fifth Amendment to the United States Constitution." The respondent is specifically referencing the permanency hearing conducted by the trial justice on September 14, 2020, wherein DCYF was seeking approval for a service plan change to adoption. Altogether, respondent maintains that the trial justice's "prejudicial" ruling on reasonable efforts and determination that the children could

not be safely reunited with respondent "made the resulting 'Decision' on termination a foregone conclusion." DCYF argues that the Family Court was statutorily required to conduct a permanency hearing within a twelve-month period.

We likewise view respondent's argument as unavailing. Pursuant to G.L. 1956 § 40-11-12.1(a), DCYF is required to file a motion requesting a permanency hearing on the status of the child within a twelve-month period after a child is placed in the care of DCYF. When determining the order of permanency, the court considers factors that include:

> "(1) The appropriateness of the department's plan for service to the child and parent;
> "(2) What services have been offered to strengthen and reunite the family;
> "(3) Where return home of the child is not likely, what efforts have been or should be made to evaluate or plan for other modes of care;
> "(4) Any further efforts that have been, or will be made, to promote the best interests of the child; and
> "(5) The child's health and safety shall be the paramount concern." Section 40-11-12.1(d)(1)–(5).

Under § 40-11-12.2(a), at the permanency hearing, DCYF must present a written reunification and/or permanency plan to the court for approval. The plan must include, among other options, whether and, if applicable, when the child will be placed for adoption. Section 40-11-12.2(a).

At the conclusion of the permanency hearing in the present case, the trial justice, in approving the service plan, found that DCYF had exercised reasonable

- 32 -

efforts to reunite the children with respondent, which is a factor that the trial justice was to consider. *See* § 40-11-12.1(d). He further noted that the TPR petitions, filed in November 2018, were pending and were still being heard by the court at that time. The trial justice stated, "The [c]ourt shall continue with hearing the TPR and make a decision at the end of the evidence being completed." We view no error in the permanency hearing conducted by the trial justice and the subsequent decision thereon, as it was statutorily required of the trial justice upon motion by DCYF.

## IV

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court terminating the respondent's parental rights with respect to his children, Jae'La G. and Jae'Ona G. The papers may be remanded to the Family Court.



STATE OF RHODE ISLAND

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | | |
|---|---|---|
| **Title of Case** | In re Jae'La G.<br>In re Jae'Ona G.<br>In re Jae'Ona G.<br>In re Jae'La G. | |
| **Case Number** | No. 2021-23-Appeal.<br>(PNG 16-612)<br><br>No. 2021-24-Appeal.<br>(PNG 16-613)<br><br>No. 2021-25-Appeal.<br>(P 18-5730)<br><br>No. 2021-26-Appeal.<br>(P 18-5729) | |
| **Date Opinion Filed** | June 17, 2022 | |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. | |
| **Written By** | Chief Justice Paul A. Suttell | |
| **Source of Appeal** | Providence County Family Court | |
| **Judicial Officer from Lower Court** | Associate Justice Stephen J. Capineri | |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Benjamin Copple<br>Department of Children, Youth, and Families<br><br>Andrew J. Johnson<br>Court Appointed Special Advocate | |
| | For Respondent:<br><br>Robert J. Caron, Esq. | |