**Supreme Court**

No. 2013-291-Appeal.
No. 2013-292-Appeal.
(05-1833-1)
(05-1833-2)

In re Steven D. et al.                              :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2013-291-Appeal.
No. 2013-292-Appeal.
(05-1833-1)
(05-1833-2)

In re Steven D. et al.          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on May 6, 2014, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided.  In these consolidated appeals, the respondents, Kathleen D. and Ronald D.[1] (collectively, respondents) appeal from a Family Court decree terminating their parental rights to their two children, Steven D. and Zachary D., for a second time.  After a careful review of the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are satisfied that cause has not been shown and that these appeals may be decided at this time.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

---

[1] For the sake of clarity and privacy, the family members will be referred to by only their first names; in so doing, we intend no disrespect.

- 1 -

**Facts and Travel**

These consolidated appeals require us to revisit the sad facts of a case with which this Court is well acquainted.[2] In July 2005, the Rhode Island Department of Children, Youth and Families (DCYF) filed neglect petitions against Ronald and Kathleen, seeking custody of their two sons: Steven, who was born on September 22, 1997, and Zachary, who was born on November 1, 2000.[3] In re Steven D., 23 A.3d 1138, 1140, 1141 (R.I. 2011). The boys initially were removed from the home when Kathleen was hospitalized and Ronald was unable to care for the children due to his own medical issues. Id. at 1141. Subsequently, the parents admitted to dependency, and the boys were committed to the care, custody, and control of DCYF until further order of the Family Court. Id. at 1142. The boys were later allowed to remain in the home, on the condition that Ronald and Kathleen cooperate with case plans developed for the family, which included that the parents "refrain from using any illegal or intoxicating substances, including alcohol." Id. at 1141. They failed.

In April 2006—eight years ago—the Family Court granted DCYF's motion to remove Steven and Zachary from their parents' home. In re Steven D., 23 A.3d at 1143. On September 14, 2007—in accordance with G.L. 1956 § 15-7-7(a)(3)[4]—DCYF filed petitions to terminate

---

[2] The facts of this case were previously detailed in our opinion, In re Steven D., 23 A.3d 1138 (R.I. 2011), to which we refer. Due to the lengthy travel and the voluminous record of this case, we will discuss only the facts and travel pertinent to the current appeals.

[3] In 1996—before Steven and Zachary were born, and while residing in Florida—Kathleen and Ronald had their parental rights terminated to three other children based on allegations of domestic violence and chronic substance abuse.

[4] Entitled "Termination of parental rights," G.L. 1956 § 15-7-7(a)(3) provides in pertinent part:

> "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the

Kathleen and Ronald's parental rights to the boys. Id. at 1146. A trial on these petitions culminated in a decree of the Family Court, terminating the respondents' parental rights. Id. at 1153. The decree subsequently was appealed to this Court. A majority of the members of this Court vacated the decree after concluding that (1) DCYF had not made reasonable efforts to reunify Kathleen and the children; (2) the determination that Ronald was an unfit parent was not proven by clear and convincing evidence; and (3) the admission of Kathleen's substance abuse test results into evidence at trial, without a foundation being laid, was in error. Id. at 1161, 1163, 1165.

After this Court issued its opinion on June 29, 2011, new case plans were developed for Ronald and Kathleen. Nothing changed; the parents made no progress and continued their alcoholic lifestyle. On November 28, 2012, DCYF filed new petitions, again requesting that the Family Court terminate both parents' rights to Steven and Zachary. A second trial, spanning ten days, commenced on March 27, 2013, and produced over 1,300 pages of trial transcripts and culminated in a 129-page written decision issued by a second Family Court justice on June 26, 2013, thereby terminating, for a second time, Kathleen and Ronald's parental rights to Steven and Zachary.

In his written decision, the Family Court justice provided a thorough review of all the

---

child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

"* * *

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home * * *."

testimony and exhibits introduced at trial, and made eighty separate findings of fact regarding Ronald's parental unfitness. Specifically, he noted that, after a substance abuse evaluation was performed, Ronald was provided with a substance abuse treatment plan and services to effectuate that plan. However, the trial justice cataloged Ronald's failure to achieve sobriety despite the numerous referrals for treatment at various service providers. The trial justice found that Ronald consistently denied that he had a problem with alcohol, denied that he needed help, and refused to acknowledge that his behavioral choices impacted the children. In support of this finding, the trial justice itemized sixteen instances where Ronald had tested positive for alcohol on either a urine or breathalyzer screen, and another eleven instances where Ronald had failed to appear for court-ordered alcohol screens.

The Family Court justice accepted the conclusion of the caseworker assigned to Ronald, "that the parents made a decision not to change their lifestyle with respect to drinking," despite the caseworker's insistence that failure to change would present a barrier to reunification with the children. The trial justice determined that "[t]he totality of the evidence clearly establishes that [Ronald] did, in fact, suffer from an alcohol problem for which treatment was provided by DCYF through substance abuse providers." He noted that "[t]he evidence clearly establishes that [Ronald] did not fully comply with the services provided, nor with the goals set forth in the case plans with respect to his alcohol problems," and concluded that Ronald "has failed and refused to comply with the various recommendations made by the service providers with respect to his refusal to acknowledge an alcohol problem and to cease taking alcohol during this entire period since the children were in DCYF custody."

The Family Court justice also made forty separate findings of fact specifically concerning Kathleen's unfitness as a parent. He found that a case plan had been developed by DCYF for

Kathleen which was similar to the one established for Ronald, and that Kathleen was also advised as to what was expected in order for her to be reunited with the children. She did not comply. Kathleen was discharged from treatment at the Providence Center—where she was receiving assistance with substance abuse, anger management, and mental health issues—after thirteen months because of her lack of progress and her failure to cooperate. The Family Court justice noted that Kathleen had told her caseworker that "the only time she didn't drink was because DCYF was making her not drink," and that she would continue to consume alcohol once she was reunited with the children. Kathleen continued to have positive urine screens for alcohol, refused to submit to some alcohol screens, and appeared at counseling sessions while visibly intoxicated.[5] Although DCYF referred Kathleen to additional providers for substance abuse and mental health counseling, the Family Court justice determined that she had made no progress with substance abuse treatment as a result of her refusal to admit that her alcohol consumption was problematic or that her behavioral choices impacted the children.

With respect to reasonable efforts, there were many; however, the record reflects that both parents chose alcohol over their children. The Family Court justice found that DCYF had referred Kathleen and Ronald to various facilities for substance abuse evaluations and counseling, as well as to additional facilities which provide family counseling services. The Family Court justice noted that taxicab services were provided to Kathleen and Ronald to transport them to and from each service provider, and to and from planned visits with the children, and that this transportation, as well as the services provided at the facilities, was paid for by the taxpayers. He determined that "[t]he clear and convincing evidence establishes that DCYF took all proper action in making referrals for the benefit of each parent," which, he noted

---

[5] After admitting at trial that testing conducted weeks earlier showed a .30 blood-alcohol level, Kathleen claimed she had "no idea why it was that high."

was primarily to address the issue of the parents' alcohol abuse. Nonetheless, he concluded that "the parents refused to comply with the requirements of the case plans and continued to drink alcohol beverages, notwithstanding the implications explained to them with respect to the reunification process." As a result, the Family Court justice declared that "[a]ny lack of reunification falls squarely at the feet of these recalcitrant parents."

Finally, the Family Court justice addressed the best interests of the children. He first found that—because Steven and Zachary had last been removed from their parents' home by DCYF on April 26, 2006—the children had not only been in DCYF custody for well over twelve consecutive months, but in fact, for more than half of their lifetimes. The trial justice found that the boys had been living in their pre-adoptive home for over two years, and "were attached to the pre-adoptive family and their needs were being met by them." He noted that "[t]he children are happy and bonded with their foster parents who wish to adopt them and they wish to be adopted by them." The trial justice found that the boys "repeatedly told their counselor, Ms. Brackley, that they did not want to return to live with their biological parents and wanted to be adopted by the family that they were, in fact, living with," the pre-adoptive parents. The trial justice also found that the boys were afraid to tell Ronald and Kathleen that they wanted to be adopted. He accepted the conclusion of the boys' social worker, who had determined that, based upon a reasonable degree of clinical certainty, "the best interests of the children were to live with and be adopted by the family they were living with now so that they may grow."

In conclusion, the Family Court justice declared that, in accordance with § 15-7-7(3), "the children have been placed in the legal custody of [DCYF] for at least twelve months," and that Ronald and Kathleen "were offered or received services to correct the situation which led to the children being placed," but that there was "not a substantial probability that the children will

be able to return safely to the parents' care within a reasonable period of time considering the children's age and the need for a permanent home." Moreover, he determined that, pursuant to § 15-7-7(a)(2)(iii),[6] Ronald and Kathleen were "unfit by reason of conduct or conditions seriously detrimental to the children," namely that "the parents have a chronic substance abuse problem and that all of the credible testimony and documentary evidence clearly indicates * * * that the children will not be able to return to the custody of the parents within a reasonable period of time." The decision concluded by terminating Kathleen and Ronald's parental rights to Steven and Zachary, and a decree reflecting this termination was entered on July 8, 2013.

**Standard of Review**

This Court is cognizant that "[n]atural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." In re Destiny D., 922 A.2d 168, 172 (R.I.

---

[6] Section 15-7-7(a)(2)(iii) states, in pertinent part:

> "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

> "* * *

> "(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

> "* * *

> "(iii) The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem * * * ."

- 7 -

2007) (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). As such, "due process requires that 'a Family Court trial justice * * * find, by clear and convincing evidence, that a parent is unfit before terminating his or her rights to a child.'" In re Lauren B., 78 A.3d 752, 759 (R.I. 2013) (quoting In re Evelyn C., 68 A.3d 70, 77 (R.I. 2013)).

We therefore review "termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence." In re Amiah P., 54 A.3d 446, 451 (R.I. 2012) (quoting In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008)). Conducting this review requires us to engage in a three-step process in which we (1) review the trial justice's finding of parental unfitness; (2) consider whether reasonable efforts at reunification were made by DCYF; and (3) evaluate the finding that termination of parental rights is, in fact, in the best interest of the child. In re Pricillion R., 971 A.2d 599, 604 (R.I. 2009) (citing In re Brooklyn M., 933 A.2d 1113, 1122 (R.I. 2007)). In so doing, we are mindful that the Family Court justice's findings in a termination proceeding "are accorded great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or the [Family Court] justice overlooked or misconceived material evidence." In re Lauren B., 78 A.3d at 759 (quoting In re Charles L., 6 A.3d 1089, 1093 (R.I. 2010)).

**Analysis**

Before this Court, each parent filed a separate appeal and corresponding memoranda. First, Ronald argues that the Family Court justice erred in finding that (1) he was an unfit parent; (2) that DCYF made reasonable efforts to correct the situation that led to the children's placement outside of the home; and (3) that the termination of his parental rights was in the best interests of the children. We reject these contentions.

In accordance with § 15-7-7(a)(2)(iii), a court may terminate parental rights upon finding,

by clear and convincing evidence, that:

> "The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to * * * [that] [t]he child has been placed in the legal custody or care of [DCYF] and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem * * *."

Alternatively, parental rights may also be terminated pursuant to § 15-7-7(a)(3), upon a finding that the child has been in DCYF custody for at least twelve months, that the parent has been offered or received services to correct the situation, and that "there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]" Notably, a court's termination of parental rights may be based on the grounds enumerated in either provision. See In re Lyric P., 90 A.3d 132, 140 (R.I. 2014) ("A termination of rights may be supported on either ground, that [the] respondent was unfit or that the child was unlikely to be able to return to [the] respondent's care within a reasonable period.").

In the case at bar, we are satisfied that the Family Court justice made sufficient findings of unfitness—in accordance with § 15-7-7(a)(2)(iii)—to stand independently, and we also hold that sufficient findings were made to support the termination of Ronald's parental rights on either ground. Concerning the finding that Ronald was an unfit parent, the Family Court justice noted that Ronald had undergone a clinical evaluation which concluded that he had a substance abuse problem and that treatment was necessary. The trial justice then detailed the plethora of services provided to Ronald to remedy this situation, but found that these services were ineffective solely due to Ronald's own recalcitrance. After noting that the children had been in foster care for

- 9 -

more than half of their lives and that Ronald refused to achieve sobriety, the trial justice concluded that Ronald's prognosis indicated that Steven and Zachary would not be able to return to the home within a reasonable time. We are satisfied that the trial justice did not err in reaching this conclusion and therefore refuse to disturb this finding.

We also disagree with Ronald's contention that the trial justice erred by finding that DCYF had made reasonable efforts at reunification. The record reflects that the failure in this case was Ronald's, and not that of DCYF. When reviewing whether or not DCYF has made reasonable efforts at reunification, "we employ a 'totality of the circumstances approach,' pursuant to which 'the efforts required from DCYF to satisfy the reasonable efforts standard vary with the differing capacities of the parents involved.'" In re Gabrielle D., 39 A.3d 655, 666 (R.I. 2012) (quoting In re Kayla N., 900 A.2d 1202, 1209 (R.I. 2006)). Thus, "[t]he criterion of 'reasonable efforts' is 'subject to a case-by-case analysis [that takes] into account, among other things, the conduct and cooperation of the parents.'" Id. (quoting In re Nicole B., 703 A.2d 612, 618 (R.I. 1997)).

Furthermore, reasonable efforts must be made by DCYF, "regardless of the unlikelihood of their success." In re Natalya C., 946 A.2d 198, 203 (R.I. 2008) (quoting In re Manuel P., 889 A.2d 192, 198 (R.I. 2006)). As such, "[w]e have recognized that reunification may not always be possible even when DCYF has made the requisite 'reasonable efforts.'" In re Lauren B., 78 A.3d at 760 (quoting In re Gabrielle D., 39 A.3d at 666). Therefore, "we do not fault [DCYF] when the treatment received does not resolve the underlying problem or when a parent's recalcitrance to treatment precludes reunification." Id. (quoting In re Gabrielle D., 39 A.3d at 666); see also In re Jose Luis R.H., 968 A.2d 875, 882 (R.I. 2009) (noting that DCYF "need not undertake extraordinary efforts to reunite parent and child") (quoting In re Diamond Y., 915

- 10 -

A.2d 1283, 1288 (R.I. 2007)).

In this case, the trial justice detailed how DCYF not only referred Ronald and Kathleen to various facilities for substance abuse evaluation and treatment, parent and child evaluations, and mental health counseling, but also provided them with transportation to and from the appointments. Our review of the record reveals that despite Ronald's consistent denials that he has a substance abuse problem or that he was in need of services, DCYF met its obligation by offering ample services to address his chronic drinking. Thus, we are confronted with yet another case where DCYF's efforts—undertaken over a course of seven years—"were consistently undermined, however, by the parents' reticence, their seemingly blind support of each other, and their collective allegiance to utter denial." In re Nicole B., 703 A.2d at 618-19 (citing In re Kristen B., 558 A.2d 200, 204 (R.I. 1989) (explaining that termination was proper when the parents consistently denied existence of abuse and were unwilling to work toward reunification)). Nonetheless, "[w]hen the welfare of a child is concerned, [DCYF] and the [Family] [C]ourt have the duty to request compliance with services offered and the completion of programs to be certain that respondents have, in fact, addressed their problems." In re Michael F., 665 A.2d 880, 882 (R.I. 1995). Thus, it is clear to this Court that, despite the fact that DCYF provided each parent with the services necessary for reunification, both Ronald and Kathleen either failed or refused to comply with each and every case plan and squandered a second opportunity to meaningfully engage in the services provided.

We now turn to Ronald's final contention that the trial justice erred in finding that the termination of his parental rights were in the best interests of the children. It is well settled that, after a trial justice makes a determination of parental unfitness, "the best interests of the child outweigh all other considerations." In re Destiny D., 922 A.2d at 173 (quoting In re Kristen B.,

558 A.2d at 203). Accordingly, a trial justice's determination of the best interests of a child includes "the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." In re Christopher B., 823 A.2d 301, 317 (R.I. 2003) (quoting In re Stephanie, 456 A.2d 268, 271 (R.I. 1983)).

We are satisfied that the Family Court justice appropriately considered the relevant factors before coming to the conclusion that the children's best interests would be served by remaining in the care of their pre-adoptive family. The trial justice indicated that Steven and Zachary had spent more than half their lives outside of the custody of their biological parents. He detailed the boys' frustration—as testified to by their counselor, Ms. Brackley—at the lack of permanency of their placement, as well as the fact that their scheduled visits with Ronald and Kathleen repeatedly were canceled due to medical issues or because the parents were drunk when they arrived for the visits. He noted that Zachary had been diagnosed with fetal alcohol syndrome, and that both children had been diagnosed with ADHD and post-traumatic stress disorder. He also gave credence to the children's concern that "they would be returned to an atmosphere that was counter-productive to their growth, particularly with respect to the mother's attitude and actions with respect to drinking, yelling and screaming."[7]

In contrast, the Family Court justice found that Steven and Zachary "were quite well adjusted in their foster home," and were happy and bonded with their foster parents, and that the boys' needs were being met by the foster parents. The trial justice also deemed it prudent to consider Steven's interest in remaining with his current placement, given his age and need for

---

[7] The trial justice specifically accepted Steven's concerns that, if he were to be returned to his parents, Kathleen and Ronald would "go back to doing what they were doing to get us taken away. We'd just get taken away again like before. * * * My mom would go back to drinking, and I would have to take care of Zachary."

- 12 -

permanency. Finally, the trial justice accepted the expert testimony of Ms. Brackley, who opined that, based upon a reasonable degree of clinical certainty, "the boys would be best served by remaining in the safe and nurturing environment of the pre-adoptive family." After careful review of the record, we are satisfied that the trial justice's findings are not clearly wrong and that he did not overlook or misconceive material evidence. We refuse to disturb the Family Court justice's conclusion that termination of Ronald's parental rights was in the best interests of the children.

Lastly, Kathleen raises a single issue before this Court—namely, that the Family Court justice erred in arriving at his findings, as set forth in the decision, because DCYF did not include as part of its case plan any interaction between Kathleen and the children's foster parents. Thus, Kathleen argues that DCYF's "failure to incorporate interaction with the foster parents" should result in this Court's vacating of the Family Court decree. We note that Kathleen has not cited any law in support of this contention. We deem this argument to be without merit.

Whether a petition to terminate rights is based on grounds enumerated in § 15-7-7(a)(3)—that the child was unlikely to return to the parent's care within a reasonable period—or § 15-7-7(a)(2)(iii)—that a parent is unfit by reason of conduct or conditions seriously detrimental to the child, such as chronic substance abuse—reasonable efforts toward reunification must be made by DCYF before parental rights may be terminated. This Court previously has held that "[r]easonable efforts toward reunification must be demonstrated by clear and convincing evidence and may be substantiated by attempts to provide the family with services, case plans, visitation, and furnishing the parent with information of the child's well being." In re Isabella C., 852 A.2d 550, 559 (R.I. 2004) (citing In re John W., 682 A.2d 930, 932 (R.I. 1996)). The

- 13 -

stated purpose for such efforts, however, is to "encourage and strengthen the parental relationship so that the child can safely return to the family." Section 15-7-7(b)(1).

Accordingly, DCYF's efforts are aimed at accomplishing reunification, so that termination proceedings may be circumvented, and are solely for the benefit of the parent and child. As such, we see no basis in law for Kathleen's contention that DCYF is required to provide interaction between a biological parent and a foster parent.[8] The placement of neglected or abused children in foster homes is designed to protect and nurture the children during this difficult period in their young lives. Foster parents have no role in DCYF's efforts at reunification.

We are satisfied that the trial justice did not err in finding, by clear and convincing evidence, competent proof to support the termination of Ronald and Kathleen's parental rights in accordance with § 15-7-7(a)(3) and § 15-7-7(a)(2)(iii). It is clear to this Court that, after having been provided with a second chance at parenting, the parents have forfeited yet another opportunity to achieve sobriety and reunification with their children. Nonetheless, "[c]hildren 'are entitled to permanency; they should not have to wait for an indeterminate period of time to find out if their parents will successfully obtain and maintain a substance free lifestyle.'" In re Amiah P., 54 A.3d at 454 (quoting In re Shawn M., 898 A.2d 102, 108 (R.I. 2006)).

## Conclusion

For the reasons set forth in this opinion, we deny and dismiss the respondents' appeals and affirm the decree of the Family Court terminating the respondents' parental rights to Steven and Zachary. The papers in this case may be returned to the Family Court.

---

[8] The record discloses that Kathleen was given—and vehemently refused—the option of having an open adoption with Steven and Zachary's foster parents. As a result, the termination of respondents' parental rights to Steven and Zachary also includes termination of "the right to notice of any subsequent adoption proceedings involving the child[ren]." Section 15-7-7(a).


**TITLE OF CASE:**     In re Steven D. et al.

**CASE NO:**     No. 2013-291-Appeal.
No. 2013-292-Appeal.
(05-1833-1)
(05-1833-2)

**COURT:**     Supreme Court

**DATE OPINION FILED:**     June 27, 2014

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**     Providence County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Howard I. Lipsey

**ATTORNEYS ON APPEAL:**

For DCYF:  Karen A. Clark
Department of Children, Youth & Families

For CASA:  Shella R. Katz
Court Appointed Special Advocate

For Respondents:  William J. Delaney, Esq.
Susan B. Iannitelli, Esq.