June 30, 2023

**Supreme Court**

No. 2022-77-Appeal.
(P 19-3074)

In re R.M.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re R.M.                    :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The respondent mother, Esmeralda M.,
appeals from a November 24, 2021 decree[1] of the Family Court terminating her
parental rights with respect to her daughter, R.M.[2]  On appeal, she contends that the
trial justice erred in finding that the Department of Children, Youth, and Families
employed reasonable efforts to achieve reunification between R.M. and her.

This appeal came before the Supreme Court pursuant to an order directing the
parties to appear and show cause why the issues raised in this appeal should not be
summarily decided.  After considering the parties' written and oral submissions and

---

[1]     The decree also terminated the parental rights of R.M.'s natural father, Luis
M.  He filed a separate appeal (No. 2021-336-A), and this Court issued its decision
affirming that decree as to Luis M. on June 2, 2023. *In re R.M.*, 293 A.3d 1255, 1267
(R.I. 2023).

[2]     To protect the identity of the child, in this opinion, we will refer to the
respondent mother by her first name and last initial only.  We intend no disrespect.

after carefully reviewing the record, we conclude that cause has not been shown and that this appeal may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

# I

## Facts and Travel

On June 11, 2019, DCYF filed a petition in the Family Court to terminate the parental rights of both R.M.'s natural father (Luis M.) and Esmeralda on the grounds that they were unfit to parent R.M. pursuant to G.L. 1956 §§ 15-7-7(a)(2)(i) and (a)(3). A trial commenced in the Family Court on April 5, 2021, and it continued on April 6 and 7. We relate below the salient aspects of that trial as they relate to the decision concerning Esmeralda.

## A

### The Testimony of Kimberly Marino

Kimberly Marino, a social caseworker with the DCYF Family Services Unit, testified that, between April of 2015 and May of 2018, she was assigned to deal with issues regarding Esmeralda's care for her four older children.[3] She stated that, as to

---

[3]   It is important to note that Esmeralda was engaged in a trial relative to the termination of her parental rights as to her four older children during the time case planning was ongoing relative to R.M. Her parental rights to those children were terminated in September of 2019—a decision that in due course was affirmed by this Court. *In re Manuel P.*, 252 A.3d 1211, 1221 (R.I. 2021).

those children, DCYF had identified "mental health and parenting and domestic violence" as areas of concern relative to Esmeralda.

Ms. Marino testified that, on May 11, 2018, a DCYF investigator told her about a "hotline" call that the investigator had received, informing DCYF that the housing authority had observed Esmeralda with a newborn child who she said was her daughter. Ms. Marino testified that DCYF removed R.M. from Esmeralda that same day. Ms. Marino also stated that Esmeralda told her that the newborn child had been born on March 25, 2018 in the Dominican Republic.

Ms. Marino testified that she immediately began to develop a case plan for R.M. However, she added that, because of Esmeralda's "erratic behavior," she was unable to sit down in a meeting room at the DCYF office with Esmeralda and discuss the case plan "start to finish" with her. This first case plan, which was admitted as a full exhibit, referenced a "Behavioral Change Required to Address the Risks Identified," pursuant to which Esmeralda would "accept supports and services to address her mental health/self-care needs" and would "demonstrate an understanding of her own mental health needs and how it relates to her ability to parent." The first case plan set forth "Action Steps" whereby Esmeralda might achieve the just-referenced "Behavioral Change," including the requirement that she "sign releases of information so that DCYF and providers can communicate for the purposes of treatment coordination." Ms. Marino stated that she did not make any

new referrals for mental health treatment for Esmeralda because, at that point in time, DCYF was monitoring the prior referrals that had been made.

The case plan also referenced as an additional "Behavioral Change" the goal that Esmeralda would (1) "behave in ways that meet [R.M.'s] basic needs as well as her need for nurturing, stimulation and to feel safe" and (2) "provide a safe home environment." To achieve this, the case plan required, *inter alia*, that Esmeralda "[p]ractice learned skills for meeting [R.M.'s] physical and emotional needs during visitation."[4] Ms. Marino also testified that DCYF referred Esmeralda to the Families Together visitation program.

Ms. Marino also testified that, between May and August of 2018, she saw Esmeralda approximately six times at the DCYF office. She explained that her contact with Esmeralda was "random and sporadic" and that Esmeralda "wasn't herself" during the just-referenced period of time. Ms. Marino stated that DCYF "really emphasized" Esmeralda's mental health in her case plan goals because the agency was "concerned for her."

Ms. Marino further testified that she learned that Esmeralda had been hospitalized in September and October of 2018 with respect to her "mental health issues." She stated that, during this period, she and Esmeralda "would exchange

---

[4] A second case plan was also admitted as a full exhibit. Ms. Marino indicated that the two case plans "were the same case plans" as had been in place "for years * * *."

messages often," but actually "reached each other" only once during Esmeralda's hospitalizations.

It was further Ms. Marino's testimony that, during the fall of 2018, she discovered that Esmeralda had been arrested twice for assaulting a police officer. When asked whether she was able to persuade Esmeralda "to cooperate with any mental health counseling during this time frame," Ms. Marino stated that Esmeralda did attend such counseling "for a bit," but she added that she did not know how many sessions Esmeralda attended. She further testified that she did not receive any documentation as to whether or not Esmeralda completed her mental health counseling.

Ms. Marino also noted that Esmeralda was again arrested on January 7, 2019 and one week later was transferred, "by way of a court order," to Eleanor Slater Hospital,[5] where she remained until July of 2019. She stated that she did not have either access to or contact with Esmeralda while she was in the hospital. She added

---

[5]     Eleanor Slater Hospital "is operated by the State of Rhode Island's Department of Behavioral Healthcare, Developmental Disabilities, & Hospitals (BHDDH)." *About Eleanor Slater Hospital*, Rhode Island Department of Behavioral Healthcare, Developmental Disabilities & Hospitals, https://bhddh.ri.gov/eleanor-slater-hospital (last visited June 13, 2023). "The hospital treats patients with acute and long-term medical illnesses, as well as patients with mental health conditions." *Id.*

that, when DCYF would inquire, the hospital would not "even confirm or deny if somebody" was a patient in that facility.

Ms. Marino further testified that Esmeralda was unable "to overcome the goals and barriers that [DCYF] had addressed relating to her reunification with [R.M.]" prior to her being committed to the hospital. She elaborated that, prior to her commitment, Esmeralda had been unsuccessful with "[t]he mental health pieces, the parenting pieces, and also completing her own domestic violence education." Ms. Marino added that Esmeralda never successfully completed the goals set forth in her two case plans.

Ms. Marino testified that she met with Esmeralda after her release from Eleanor Slater Hospital, and Esmeralda indicated that she wanted to continue with her previous counselor. However, that counselor stated that Esmeralda was "inconsistent," which prevented the counselor from being able to provide a recommendation as to Esmeralda's future mental health treatment. Ms. Marino added that there was never a time when Esmeralda exhibited "acceptable" conduct in the presence of R.M. She added that, although Esmeralda's behavior was "erratic," she nonetheless believed that Esmeralda "loves her daughter."

**B**

**The Testimony of Esmeralda**

Esmeralda testified that, as of May of 2018, she had given birth to five children, but that, as of that date, four of her children were not living with her and had been in the temporary custody of DCYF for some time. It was Esmeralda's testimony that R.M., her fifth child, was born on March 25, 2018, in the Dominican Republic and that she did not inform DCYF about that fact.

When asked if DCYF began case planning with her after R.M. was removed in May of 2018, Esmeralda stated: "At no point did they sit down with me and tell me or give me hope that I was going to get my daughter back. They didn't sit down and make a plan with me, no." She acknowledged that, as of May of 2018, "it had been at least three years" that she had been case planning with DCYF regarding the four older children. Esmeralda also acknowledged that the case plans for the four older children required her to address her mental health issues. She also agreed that DCYF asked her to continue to address her mental health issues after R.M. was removed from her custody.

Esmeralda testified that, after R.M. was removed from her custody, she "had a breakdown" and "wasn't [her]self." She acknowledged that this breakdown affected her "ability to engage in any services with any referral providers" so that she might be reunified with R.M. Esmeralda also acknowledged that, between May

and December of 2018, she was hospitalized for more than a week at Rhode Island Hospital on three separate occasions. She testified that she attended "a couple of the visits" with R.M.; but she stated that one day she was informed that she would not be allowed to visit anymore.

When asked if it was true that, between May of 2018 and January of 2019, she was "not consistently attending" her visits with her mental health counselor, Esmeralda replied: "Well, what mental health counselor?" When asked to name the counselor "that [she was] going to," Esmeralda replied that she did not remember the counselor's name; but she stated that she had been seeing a counselor at the time.

In addition, Esmeralda acknowledged that, in January of 2019, a court had ordered her to undergo a competency evaluation at Eleanor Slater Hospital. She also agreed that she was thereafter deemed incompetent to stand trial and that, after the doctors worked "to restore [her] competency," she was released in July of 2019. Esmeralda acknowledged that no visits took place between R.M. and her during the period of time when she was in the hospital. She further acknowledged that she "wasn't [her]self" prior to the time when she was committed to Eleanor Slater Hospital, but she added that she was "fine" after she was released from the hospital.

# C

## The Testimony of Amanda Grandchamp

Amanda Grandchamp (a licensed mental health counselor, employed by the Families Together program) testified that, during the initial intake interview with the Families Together program on August 14, 2018, Esmeralda was "not appropriately engaged." Ms. Grandchamp testified that she thereafter arranged for Esmeralda's subsequent visits with R.M. (on August 29, 2018 and September 5, 12, and 19, 2018) to take place at the DCYF office because "there were concerns about [Esmeralda's] behavior during visits." She explained that Esmeralda's "behavior was never consistent" and "was unpredictable." She further explained that Esmeralda's "mood changed frequently;" she stated that Esmeralda "could be laughing, smiling," while at "other times she would be crying."

Ms. Grandchamp testified that she reminded Esmeralda that she needed to be compliant with the mental health requirements encompassed in her case plan in order to participate in the Families Together program, but she said that Esmeralda "insisted that she was in treatment and taking medication." Ms. Grandchamp also stated that she asked Esmeralda to sign a release so that she could obtain documentation concerning her mental health treatment, but that she was unable to get the release signed because Esmeralda "had to identify a provider and was not able to do that."

Ms. Grandchamp acknowledged that there was never a time during the visits when Esmeralda "did not appear to be struggling with a mental health illness." She likewise confirmed that there was never a time when Esmeralda appeared "stable enough to parent [R.M.] on her own." Ms. Grandchamp testified that Esmeralda did not attend any subsequent visits because she had been "psychiatrically hospitalized."

Ms. Grandchamp stated that Esmeralda was ultimately discharged from the Families Together program because she was not compliant with the requirements concerning the mental health treatment that were set forth in her case plan. In her September 30, 2018 discharge report, Ms. Grandchamp recommended that Esmeralda have "fully supervised and closely monitored visits [with R.M.] in a restrictive setting" and that she undergo a psychological evaluation.

## D

### The Testimony of Jane Ahles

Jane Ahles, a DCYF casework supervisor, also testified. She stated that, in November of 2018, Esmeralda's "demeanor was very erratic." She elaborated that Esmeralda would be "[h]appy one moment" and "then very withdrawn the next;" she said that "[s]ometimes she could be very abrupt, very confrontive, very angry," while at other times she was "kind of laughing * * *." It was her testimony that

Esmeralda's "behavior was very concerning * * * as far as her mental health and stability as to being able to even interact with the children at this point in time."

Ms. Ahles testified that, between May of 2018 and July of 2019, DCYF did not make any direct referrals for psychiatric services because Esmeralda "wouldn't sign releases." She explained that, because Esmeralda would not sign the releases, DCYF was unable to "determine exactly what treatment she was getting and what help to refer her for * * *." She added that DCYF accordingly decided to refer Esmeralda to the Families Together program "to try and look at what we needed in order to work towards permanency and reunification * * *." Ms. Ahles testified that DCYF was aware that Esmeralda was receiving psychiatric services; however, she pointed out that Esmeralda "wouldn't disclose what services she was getting" and would tell DCYF that that subject "was her private business." She further testified that Esmeralda said that "she had her own doctors" and that "she didn't need ours." Ms. Ahles stated that trying to have Esmeralda sign releases was "an ongoing process;" she added that, time after time, Esmeralda would promise that she would sign the releases "next time."

Ms. Ahles testified that, because Esmeralda was "in and out" of Rhode Island Hospital, DCYF knew that "she was getting some type of psychiatric treatment," but she also stated that Esmeralda "was not forthcoming about signing releases * * *." She added that, although Esmeralda wanted DCYF "to bring the baby * * * to visit"

with her in the hospital, such a visit was deemed to be "not appropriate because it would have been on the ward" and "[t]here was no way to safely supervise a visit." She also testified that DCYF could not make a new referral for psychiatric treatment for Esmeralda while she was hospitalized and receiving psychiatric treatment from a different "agency."[6]

**E**

**The Decision of the Trial Justice**

The trial justice issued a forty-page written decision on October 14, 2021, granting DCYF's petition to terminate Esmeralda's parental rights to R.M.[7] He first summarized in detail the relevant trial testimony, referencing several of the trial exhibits. He then proceeded to make thirty-eight findings of fact. The trial justice began his decision by finding that DCYF had "proven by clear and convincing evidence that [R.M.] remained in foster care for more than twelve months;" that Esmeralda was "offered or received services to correct the situation which led to the child being placed; and that there is not a substantial probability that the child will be able to return safely to [Esmeralda's] care within a reasonable period of time,

---

[6] Ms. Ahles stated that she did not visit Esmeralda while she was a patient at Eleanor Slater Hospital, and she said that she could not recall whether anyone else from DCYF attempted to go there to speak with Esmeralda during her hospitalization.

[7] The trial justice issued an amended decision on November 23, 2021 to correct three minor typographical errors. There were no substantive changes.

considering the child's age and need for a permanent home." *See* § 15-7-7(a)(3). He also found that Esmeralda was "unfit by reason of conduct and conditions seriously detrimental to the child, such as the institutionalization of [Esmeralda], * * * of such duration to render it improbable for [her] to care for the child for any extended period of time." *See* § 15-7-7(a)(2)(i).[8]

In support of his determination that DCYF met its burden of proving by clear and convincing evidence that it employed reasonable efforts to achieve reunification, the trial justice first found that the agency had created two case plans. And he further found that DCYF provided referrals for a supervised visitation and parenting program; however, he expressly noted that Esmeralda's "behavior was so inappropriate during these visits that she was discharged by the program." Moreover, the trial justice found that, although "DCYF continued with services that were already in place for [Esmeralda] to address her mental health" and "allowed her some latitude in picking a suitable provider," Esmeralda "refused to sign releases to enable DCYF to document attendance and assess progress." He also found that

---

[8] In view of the fact that the only issue properly before us is whether DCYF made reasonable efforts to achieve reunification between Esmeralda and R.M., we need not summarize the trial justice's reasoning in support of his findings that Esmeralda was unfit to parent R.M. and that the termination of Esmeralda's parental rights was in R.M.'s best interests. *See, e.g., In re James H.*, 181 A.3d 19, 26 n.9 (R.I. 2018); *In re Jake G.*, 126 A.3d 450, 458 (R.I. 2015).

"there is no evidence that any services that [Esmeralda] may have engaged in had a positive impact on her protective capacity."

On November 24, 2021, the decree terminating Esmeralda's parental rights to R.M. was entered. A timely notice of appeal was filed on December 13, 2021.

## II

## Issue on Appeal

Esmeralda contends that the trial justice erred in finding by clear and convincing evidence that DCYF made reasonable efforts to achieve reunification between Esmeralda and R.M., specifically during the time when Esmeralda was committed to Eleanor Slater Hospital.

## III

## Standard of Review

This Court has consistently stated that "due process requires that, before the state may terminate a parent's rights in his or her children, the state must support its allegations by clear and convincing evidence." *In re Steven D.*, 23 A.3d 1138, 1155 (R.I. 2011) (emphasis omitted); *see also In re James H.*, 181 A.3d 19, 25 (R.I. 2018). On appeal, we review "termination of parental rights rulings by examining the record to establish whether the [trial] justice's findings are supported by legal and competent evidence." *In re Ariel N.*, 892 A.2d 80, 83 (R.I. 2006); *see also In re Lucas D.*, 272 A.3d 109, 116 (R.I. 2022). The findings of the trial justice "are

- 14 -

entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *In re Victoria L.*, 950 A.2d 1168, 1174 (R.I. 2008) (internal quotation marks omitted); *see also In re Lucas D.*, 272 A.3d at 116.

## IV

## Analysis

We turn now to Esmeralda's contention that the trial justice erred in finding that DCYF had satisfactorily proven that it employed reasonable efforts to achieve reunification between Esmeralda and R.M., specifically during the time when Esmeralda was committed to Eleanor Slater Hospital.[9]

It is well established that "[w]hen a petition to terminate parental rights is filed pursuant to § 15-7-7, and before a parent's rights can be terminated, DCYF must prove by clear and convincing evidence that regardless of the parent's behavior, DCYF has made reasonable efforts to encourage and strengthen the parental relationship * * *." *In re Jah-nell B.*, 116 A.3d 784, 793 (R.I. 2015) (internal quotation marks and brackets omitted). We have stated in that regard that "the concept of reasonable efforts is not a rigid standard, but one of some flexibility * * *." *In re Amber P.*, 877 A.2d 608, 618 (R.I. 2005); *see also In re Jah-nell B.*,

---

[9] At oral argument before this Court, Esmeralda's attorney conceded that DCYF had made reasonable efforts prior to her commitment to Eleanor Slater Hospital.

- 15 -

116 A.3d at 793. Significantly, DCYF is not required to "demonstrate that it took extraordinary efforts;" but rather it must "employ reasonable efforts, and the reasonableness of such efforts must be determined from the particular facts and circumstances of each case." *In re Violet G.*, 212 A.3d 160, 167 (R.I. 2019) (internal quotation marks omitted); *see also Jae'La G.*, 276 A.3d 378, 391 (R.I. 2022); *In re Rosalie H.*, 889 A.2d 199, 208 (R.I. 2006). Furthermore, "[w]hat constitutes reasonable efforts will vary with the differing capacities of the parents involved * * *." *In re Steven D.*, 23 A.3d at 1156 (internal quotation marks omitted); *see also In re Max M.*, 116 A.3d 185, 195 (R.I. 2015). Moreover, "reunification may not always be possible even when DCYF has made the requisite reasonable efforts." *In re Lauren B.*, 78 A.3d 752, 760 (R.I. 2013) (internal quotation marks omitted); *see also In re Steven D.*, 93 A.3d 978, 985 (R.I. 2014).

Esmeralda argues that "[t]he trial justice was clearly wrong to conclude that DCYF offered services reasonably designed to address or correct" Esmeralda's "mental health needs * * *." This Court has repeatedly stated that DCYF is not required to "be the sole provider of services to the parents; rather, the services may be offered by [DCYF] *or* received elsewhere." *In re Natalya C.*, 946 A.2d 198, 203 (R.I. 2008) (emphasis in original); *see also In re Evelyn C.*, 68 A.3d 70, 80 (R.I. 2013); *In re Gabrielle D.*, 39 A.3d 655, 666 (R.I. 2012). It is undisputed that Esmeralda was receiving mental health treatment while she was committed to

- 16 -

Eleanor Slater Hospital. As such, DCYF was not required to offer additional services to address Esmeralda's mental health during this time. And it is important to note that, in his summary of "the competent and credible evidence presented at trial," the trial justice explicitly observed that Ms. Marino had testified that she "attempted to have contact with [Esmeralda] when [she] was committed to Eleanor Slater Hospital, but staff at the hospital would not even acknowledge [her] presence there."

In the same vein, Esmeralda faults DCYF for not utilizing her guardian *ad litem* (who was representing her interests in the termination of parental rights proceedings relative to the four older children) in order "to facilitate communication" with Esmeralda during this time. Although it can certainly be argued that DCYF might have attempted alternative methods to contact Esmeralda during this time, the pertinent question is whether DCYF "offered services that amount to a reasonable effort to correct the situation that led to the child[]'s removal from the parent's care." *In re Briann A.T.*, 146 A.3d 866, 873 (R.I. 2016) (quoting *In re Lauren B.*, 78 A.3d at 760). DCYF created a case plan with her and immediately identified the importance of addressing Esmeralda's mental health needs and of having the releases signed. DCYF made ongoing attempts to have her sign releases, but she put them off and would not disclose information about her treatment, either prior to or during her multiple hospitalizations at Rhode Island

Hospital. Once she was hospitalized at Eleanor Slater Hospital, the ability to communicate became even more difficult, but the record reflects the fact that Ms. Marino made an attempt. Thus, DCYF made reasonable efforts under the tragic circumstances.

Likewise, the record also does not reveal whether Esmeralda was capable of having such communications during this time. Accordingly, the fact that DCYF did not utilize Esmeralda's guardian *ad litem* in order "to facilitate communication" with her during this time is not dispositive as to whether it employed reasonable efforts to achieve reunification between Esmeralda and R.M. *See Jae'La G.*, 276 A.3d at 391; *see also In re Violet G.*, 212 A.3d at 167.

Esmeralda further faults DCYF for not working with the treatment providers at Eleanor Slater Hospital. It should first be noted that DCYF was not required to provide additional mental health treatment options during this time. *See In re Natalya C.*, 946 A.2d at 203 (stating that DCYF is not required to "be the sole provider of services to the parents; rather, the services may be offered by * * * [DCYF] *or* received elsewhere") (emphasis in original). In addition, although Esmeralda's case plans required that she participate in supervised visitation with R.M., the trial justice specifically alluded to Ms. Ahles's testimony that "there was no way to safely conduct a visit in the hospital." Our review of the record confirms that, after Esmeralda was committed to Eleanor Slater Hospital, it became a practical

- 18 -

impossibility for DCYF to continue to offer such supervised visitations. *See In re Ann Marie*, 461 A.2d 394, 395 (R.I. 1983) (stating that this Court "does not expect the impossible" from DCYF). Moreover, in view of the testimony to the effect that Eleanor Slater Hospital would not even acknowledge Esmeralda's presence at that facility, we are of the opinion that DCYF would have had to employ "extraordinary efforts" to work in combination with the hospital's treatment providers. *In re Violet G.*, 212 A.3d at 167 (internal quotation marks omitted). Additionally, in light of the fact that Esmeralda was committed to Eleanor Slater Hospital in the hope of restoring her competency, we are satisfied that any additional services that DCYF theoretically could have provided would have been secondary to her mental health treatment. *See In re Raymond C.*, 864 A.2d 629, 634 (R.I. 2005) ("Until [the mother's] mental health improved to the point where she was stable, other services would have been futile."). As such, we remain unpersuaded by Esmeralda's argument that DCYF did not employ reasonable efforts simply because it did not join in the efforts of the treatment providers at Eleanor Slater Hospital.

It is important to note that Esmeralda was engaged in a trial on DCYF's petition to terminate the parental rights of her four older children while DCYF was case planning with her relative to R.M. Those matters, while addressed separately, did not exist in a vacuum and are a part of the record. DCYF and the Court

Appointed Special Advocate were well aware of what was happening with Esmeralda.

We are well aware that DCYF was ultimately required to prove by clear and convincing evidence that Esmeralda was "offered or received services to correct the situation that led to the child being placed * * *." Section 15-7-7(a)(3); *see also* § 15-7-7(b)(1) (requiring that DCYF employ reasonable efforts prior to filing its petition to terminate parental rights pursuant to § 15-7-7(a)(2)(i)); *In re Natalya C.*, 946 A.2d at 203 (stating that "the services received by parents must be designed to address or correct the particular situation that led to their child[]'s placement in DCYF's care or custody"). The trial justice recognized that "[t]he primary reason for [R.M.'s] removal was [Esmeralda's] history of DCYF involvement with [the] four older children and her severe mental health issues that adversely impacted her protective capacity." Therefore, because it is undisputed that Esmeralda received mental health treatment during the time when she was committed to Eleanor Slater Hospital, we are satisfied that DCYF met its burden of proving by clear and convincing evidence that Esmeralda "received services to correct the situation that led to [R.M.] being placed" in its custody. Section 15-7-7(a)(3).[10]

---

[10]    Esmeralda additionally asserts that "DCYF prematurely and unreasonably filed" its petition to terminate her parental rights to R.M. We are not persuaded. A child is "entitled to permanency" and "should not have to wait for an indeterminate period of time" to be reunified with a parent. *In re Donnell R-H*, 275 A.3d 1139, 1146 (R.I. 2022) (quoting *In re Eric K.*, 756 A.2d 769, 772 (R.I. 2000)). DCYF filed

- 20 -

In conclusion, because our review of the record confirms that the trial justice's findings are supported by legal and competent evidence, we hold that the trial justice did not clearly err, nor did he overlook or misconceive material evidence, in determining by clear and convincing evidence that DCYF made reasonable efforts to achieve reunification. While we acknowledge the significant mental health issues involved in this case, we are convinced that the trial justice did not err in determining that Esmeralda's parental rights should be terminated.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm the decree of the Family Court. The record may be returned to that tribunal.

---

the petition to terminate Esmeralda's parental rights after R.M. had been in its custody for over a year. At that time, Esmeralda had been hospitalized for approximately six months, and DCYF had no way of ascertaining if and when her competency might be restored. Accordingly, we are satisfied that DCYF did not prematurely and unreasonably file its petition to terminate Esmeralda's parental rights to R.M.

- 21 -

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re R.M. |
| **Case Number** | No. 2022-77-Appeal. (P 19-3074) |
| **Date Opinion Filed** | June 30, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Chief Judge Michael B. Forte |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Benjamin Copple<br>Department of Children, Youth, and Families<br><br>Andrew J. Johnson<br>Court Appointed Special Advocate |
| | For Respondent:<br><br>Kara Hoopis Manosh, Esq. |